No. 95-3916

BRUCE H. LIEN COMPANY                    *
                                         *
        Plaintiff - Appellant            *
                                         *   Appeal from the United States
        vs.                              *   District Court for the
                                         *   District of North Dakota
THREE AFFILIATED TRIBES;                 *
RUSSELL D. MASON, SR., as                *
member of the Three Affiliated           *
Tribal Business Council; MARTY           *
FOX; DAYLON SPOTTED BEAR, as             *
member of the Three Affiliated           *
Tribal Business Council; IVAN            *
JOHNSON, as member of the Three          *
Affiliated Tribal Business               *
Council; AUSTIN GILLETTE, as             *
member of the Three Affiliated           *
Tribal Business Council; GEORGE          *
FAST DOG, as member of the               *
Three Affiliated Tribal Business*
Council; ED HALL, as member of           *
the Three Affiliated Tribal              *
Business Council; P. DIANE               *
AVERY, District Judge of the             *
Tribal Court of the Three                *
Affiliated Tribes                        *
                                         *
        Defendants - Appellees           *


No. 96-1013


BRUCE H. LIEN COMPANY,                   *
                                         *   Appeal from the United States
        vs.                              *   District Court for the
                                         *   District of North Dakota
        Plaintiff - Appellee             *
                                         *

THREE AFFILIATED TRIBES;            *
RUSSELL D. MASON, SR., as           *
member of the Three Affiliated      *
Tribal Business Council; MARTY      *
FOX; DAYLON SPOTTED BEAR, as        *
member of the Three Affiliated      *
Tribal Business Council; IVAN       *
JOHNSON, as member of the Three     *
Affiliated Tribal Business          *
Council; AUSTIN GILLETTE, as        *
member of the Three Affiliated      *
Tribal Business Council; GEORGE     *
FAST DOG, as member of the          *
Three Affiliated Tribal Business*
Council; ED HALL, as member of      *
the Three Affiliated Tribal         *
Business Council;                   *
                                    *
     Defendants - Appellants        *
                                    *
P. DIANE AVERY, District Judge      *
of the Tribal Court of the Three    *
Affiliated Tribes                   *
                                    *
     Defendant                      *

———————

Submitted:  June 13, 1996

Filed:  August 28, 1996

———————

Before BOWMAN and HEANEY, Circuit Judges, and BOGUE,[*] Senior
District Judge.

———————

BOGUE, Senior District Judge.

     The Bruce H. Lien Company (Lien or the Company) appeals the District
Court's refusal to compel arbitration in Lien's dispute with the Three
Affiliated Tribes (Tribes) over matters concerning a tribal gaming
operation.  The Tribes appeal the District Court's

———————

[*]The HONORABLE ANDREW W. BOGUE, Senior United States
District Judge for the Western Division of the District of South
Dakota, sitting by designation.

denial of their motion to dismiss.  For the reasons stated below, we affirm in part and reverse in part.

I.

The parties to this dispute came together for the purpose of constructing and operating a tribal casino on trust lands within the boundaries of the Fort Berthold Indian Reservation in North Dakota.  The modern era of tribal gaming in this country was ushered in with the 1988 passage of the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 et. seq. (IGRA).  The Tribes[1] and Lien entered into a management contract pursuant to IGRA, 25 U.S.C. § 2511, whereby Lien was to assist in the financing, construction and management of the Tribes' casino at Four Bears Motor Lodge in exchange for a share of the profits of the operation.  The agreement was executed by Wilbur Wilkinson and John Rabbithead on behalf of the Tribes,[2] and Bruce Lien and Kent Mundon, for the Company.

The agreement was submitted to the Area Director of the Bureau of Indian Affairs (BIA), said agency having interim authority under IGRA to

---

[1]The Mandan, Hidatsa, and Arikara collectively comprise the Three Affiliated Tribes and are federally recognized Indian tribes which exercise their sovereignty under a federally approved constitution adopted pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. §§ 461-479.

[2]The Tribes' constitution places governing authority in a Tribal Business Council (TBC).  At the time the agreement was executed Wilkinson and Rabbithead were the TBC's Chairman and Secretary, respectively.

3

approve gaming management contracts.  25 U.S.C. §§ 81 and 2709.[3]  After receiving reports and commentary from the Office of

_____

[3]As discussed in greater detail later, IGRA established the National Indian Gaming Commission (NIGC), which was granted overall regulatory authority for Indian gaming conducted pursuant to IGRA.  25 U.S.C. § 2704.  IGRA also created the position of Chairman of the NIGC, and granted said person certain enumerated powers.  25 U.S.C. § 2705.  Prior to the time the NIGC was organized and its regulations promulgated, the Secretary of Interior was granted the interim authority for supervision of Indian gaming.  25 U.S.C. § 2709.  IGRA provides that the NIGC was to ultimately review each contract approved by the Secretary of the Interior.  25 U.S.C. §§ 2712(a) and (c)(1).  The NIGC was organized on or about February 22, 1993, with the publication of its regulations found at 25 CFR 530 et. seq.

the Solicitor, Department of the Interior, the agreement was approved by the BIA's Area Director on February 19, 1993. Construction began shortly thereafter with the casino beginning operations on July 16, 1993. There is evidence in the record to indicate the casino has been a financial success.

The management contract at issue provides for a five-year term with a two-year extension which Lien has exercised. Lien was required to invest the funds necessary to remodel the Four Bears Motel and Lodge and build a gaming casino, with the Tribes maintaining a proprietary interest in the property and facilities. The contract provided for the repayment to the company of the investment incurred in the construction of the facility, amortized over the initial five-year term of the contract. The contract further provided for the payment of the expenses of operation of the facility and provided for the split of any remaining profits, sixty percent to the Tribes and forty percent to Lien.

Regarding the issues of dispute resolution and sovereign immunity, the agreement provides that all disputes arising out of the agreement shall be subject to binding arbitration, that the arbitration process is deemed sufficient to exhaust the parties' tribal court remedies, and that, relative to the agreement's dispute resolution procedure, the Tribes waive their sovereign immunity.[4]

---

[4]Specifically, the agreement provides:

14. ARBITRATION, PROCEDURE, AND SOVEREIGN IMMUNITY
The parties recognize and acknowledge that the Three Affiliated Tribes, as Owner, is the governmental authority vested with the power to carry our governmental functions within the jurisdictional boundary of the Three Affiliated Tribes. The Owner, having full governmental authority on tribal trust land, hereby agrees as set forth herein below, to relinquish and waive any and all rights, powers, authorities, and defenses, that are vested in or available to Owner because of Owner's governmental immunity. Therefore, to the extent set forth herein, Owner Agrees that:

5

The agreement also provides that, pending arbitration of a dispute arising out of the agreement, either party may seek injunctive relief in the District Court of North Dakota.

After the gaming enterprise was up and running, Mr. Wilkinson lost his bid to be re-elected to the TBC. Many of the new faces on the TBC sought to review the actions of the former administration, including the management contract for the Four Bears Casino. Specifically, some question arose regarding Wilkinson's authority to bind the Tribes to the agreement. Although the casino appeared to operating to the financial benefit of both sides, disagreements

---

14.1 Any disputes, controversy, or claims between [the Tribes] or [Lien], arising out of or relating to this Agreement, and any breach thereof, whether material or otherwise, shall be submitted to final and binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ... . The parties further agree that by submitting this dispute to arbitration, this procedure shall constitute a full and complete exhaustion of all remedies available by and between the parties in Tribal Court. The arbitration decision shall be a final decision and shall be entered as Judgment in Tribal Court. The Judgment, without modification and unaltered, may be enforced through the Tribal Court system.

       \*   \*   \*

[The Tribes] [are] consenting to and specifically limiting [their] governmental immunity and powers, as it relates to governmental functions, the extent that all such legislative, administrative, ordinances, rulings, or decisions of Owner, during the term of this Agreement, which, in any way, shall impact the rights of Manager under the terms of this Agreement, shall be subject to arbitration as set forth herein.

6

arose between the parties. Lien believed it was entitled to recapture $2.28 million in construction and start up costs over that provided in the contract. The Tribes, through their Tribal Gaming Commission, dramatically increased licensing fees charged to Lien.

On January 31, 1995, Lien filed a demand for binding arbitration pursuant to the management agreement, seeking resolution of the construction costs and license fees issues.[5] Under the agreement, arbitration was to take place in front of a three-member panel comprised of two party-appointed arbitrators and a third neutral arbitrator agreed upon by both parties. After some delay both sides had their party arbitrators in place and a neutral arbitrator was selected.

On June 27, 1995, the NIGC "called in" the management contract, notifying the parties that it would be conducting its mandatory review of the contract and requested all documentation be submitted within sixty days. See 25 C.F.R. Part 533.1 et. seq. The Tribes thereafter sought a postponement of the arbitration proceedings pending NIGC review of the contract. Lien objected to the postponement. The arbitration panel, by two to one vote, denied the Tribes' request for postponement.

On October 2, 1995, the Tribes filed an action in the Three Affiliated Tribes' District Court (Tribal Court). The Tribal Court complaint sought a declaration that the management contract signed by former Chairman Wilkinson is null and void under Tribal law due to lack of proper authority and failure to garner approval by the

---

[5]An amended demand for arbitration requested determination of whether the Tribes had materially breached the management contract, sufficient to justify termination of the same. Lien sought damages in the amount of $25,500,943.00, as well as exemplary damages.

TBC.[6]  The Tribes further sought a preliminary injunction enjoining the arbitration process until such time that the Tribal Court had ruled on the Tribes' complaint or the NIGC had completed its review of the management contract.  Lien, by special appearance in Tribal Court, moved to dismiss the complaint for lack of jurisdiction and argued against the appropriateness of the injunction.  On October 6, 1995, Tribal Judge Diane Avery, defendant below, found that the Tribal Court had jurisdiction to hear the matter and enjoined Lien and the American Arbitration Association:

> from arbitrating disputes which have arisen under a management agreement between [Lien] and the Three Affiliated Tribes until such time that the National Indian Gaming Commission has completed its review of the Agreement and the parties have completed any changes in the Agreement which the National Indian Gaming Commission may require, or this Court has ruled on the Tribe's Complaint relative to that Agreement, whichever is sooner.[7]

Approximately one week later, Lien filed suit in the United States District Court for the District of North Dakota.  Lien requested a preliminary injunction to enforce the arbitration proceedings pursuant to the management contract, and to enjoin the Tribes, its officials and the Tribal Court Judge from interfering in the arbitration process.  Lien also moved the District Court to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et. seq.  The Tribes moved to dismiss based on lack of subject matter jurisdiction claiming that tribal remedies had not

---

[6]The Tribes' complaint further prays the Tribal Court for "[a]n order directing that an accounting of all monies paid to Company under the terms of the alleged agreement and the full repayment by the Company of any and all such monies paid thereunder to the Tribe."  Tribes' appendix at 88.

[7]Appeals from the decisions of the Tribal Court are taken to the Northern Plains Intertribal Court of Appeals, seated in Aberdeen, South Dakota.  No appeal was taken from the Tribal Court's October 6, 1995, order.

been exhausted and that the Tribes had not waived their sovereign immunity. The Tribes also argued against the merits of Lien's requested injunctive relief. Tribal Judge Avery filed a separate motion to dismiss.

The district court recognized that while both sides would seem to have common objectives, their respective actions belie that assumption. The District Court believed that the NIGC had "exclusive jurisdiction for a first determination of [the management contract's] compliance and validity." Bruce H. Lien Co. v. Three Affiliated Tribes, No. A4-95-135, mem. and order nunc pro tunc at 8 (D.N.D. Nov. 9, 1995). Based on this belief, the District Court noted that "[c]ommon sense dictates that everyone cool down until the NIGC has taken action on the contract approval with or without requirements for modification." Id. at 6. Relevant to the present appeal, the court ultimately found; i) that it had federal question jurisdiction, ii) that the NIGC has exclusive initial jurisdiction to determine the validity of the contract, iii) that the Tribal Court's injunction, while possibly "in excess of the jurisdiction of the Tribal District Court," was a permissible means of maintaining the status quo, iv) that Lien's motion for preliminary injunction to compel arbitration would be denied, and, v) that Tribal Judge Avery would be dismissed from the action. In a supplemental order, the District Court ruled that the Tribes' motion to dismiss the federal action based on sovereign immunity and/or comity was denied.

Both sides filed notice of appeal. Lien argues the District Court erred in failing to compel arbitration pursuant to the management contract and in refusing to enjoin the Tribal defendants, including the Tribal Judge, from assuming jurisdiction over any portion of the controversy. The Tribes cross appealed contending the District Court erred in holding it possessed federal question subject matter jurisdiction, and in failing to dismiss the action on the grounds of sovereign immunity or comity.

9

This is a troubling action in that it presents a "tale of two cases" quandary. If the management contract is legally valid, our course is simple. The Tribes have clearly and unequivocally waived their sovereign immunity under the contract and the parties have chosen binding arbitration as a dispute resolution procedure. The District Court of North Dakota was the selected forum in which to bring an action for injunctive relief and that forum would clearly have jurisdiction to enforce the provisions of the contract. The problem is that the Tribes are challenging the legal validity of the contract itself, specifically the actions of its former Chairman leading to the execution of the contract. This challenge to the document itself therefore calls into question all provisions contained therein (including provisions relating to arbitration, sovereign immunity, and federal district court jurisdiction).

Further compounding the problem is the matter of the NIGC's review of the management contract and the District Court and parties' perceived role of that agency relative to the issues before the court. Fundamental in the District Court's, and to some extent the Tribal Court's, analysis was the belief that the NIGC had the authority and would, in fact, resolve the question of whether or not the management contract was legally valid, i.e., whether former Chairman Wilkinson had the authority to enter into the contract on behalf of the Tribes. This, we believe, is where the District Court is in error. Our interpretation of IGRA and the regulations promulgated thereunder lead to the conclusion that disposition regarding the legal validity of the management contract is beyond the authority of the NIGC. It further appears obvious that resolution of any or all collateral issues would be pointless until a decision regarding the validity of the contract is achieved. That being the case, the issue becomes where the decision regarding the contract's validity is to be made. In the end we are convinced that the question must first be promptly

addressed in the Tribal Court, subject to appropriate review by the District Court.

To this end, we will examine management contracts under IGRA, their approval and review in general and in this particular instance, with the purpose of highlighting the considerations within and outside the authority of the federal agencies.

### A. Management contracts under IGRA

IGRA is a vast piece of legislation enacted in part as a means "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). This circuit has recently held that IGRA completely preempts the field of Indian gaming vis a vis state law. Gaming Corp. of America v. Dorsey & Whitney, 88 F.3d 536 (8th Cir. 1996) (specifically holding that "IGRA has the requisite extraordinary preemptive force necessary to satisfy the complete preemption exception to the well-pleaded complaint rule.").

The text of IGRA authorizes tribes to enter into management contracts for the operation and management of tribal gaming ventures. 25 U.S.C. § 2711(a)(1).[8] IGRA and its regulations further prescribe essential terms which must be contained in a management contract before the same can be "approved" by the NIGC's Chairman (or the Secretary of the Interior for contracts, like the present, which were submitted prior to NIGC organization). 25

---

[8]As a precursor to any tribal gaming venture involving Class II or Class III gaming, see Shakopee Mdewakanton Sioux Community v. Hope, 16 F.3d 261, 263 (describing the distinction between the various classes of gaming under IGRA), the governing body of the tribe must adopt an ordinance or resolution concerning the gaming activities. 25 U.S.C. §§ 2710(b)(1)(B), (d)(1)(A). These tribal ordinances are subject to approval by the NIGC and must be in place before a management contract can be approved.

U.S.C. § 2711(b)(1-6); 25 C.F.R. Part 531.1(a-n).[9] Along with the presence of an adequate tribal ordinance regarding gaming and satisfactory background checks for individuals and entities representing management parties, 25 U.S.C. § 2711(a), the presence of the various essential contract terms is critical regarding federal approval of management contracts.

### B. NIGC review of existing management contracts

The management contract at issue in the present case was approved by the BIA Area Director, on behalf of the Secretary of the Interior, on February 19, 1993. IGRA and the rules and regulations of the NIGC require that all management contracts approved prior to the organization of the NIGC be reviewed and approved by that agency's Chairman. 25 U.S.C. § 2512.[10] During

---

[9]The text of IGRA lists six essential terms to be included before a management contract may be approved, in addition to requiring a term that indicates management fees shall not constitute more than forty percent of a gaming enterprise's net revenues. On March 5, 1992, the Assistant Secretary of Interior sent a memorandum to all BIA Area Directors which provided fairly exhaustive guidelines to govern federal review and approval of, inter alia, management contracts. Lien's Appendix at 96-111. 25 C.F.R. §§ 531.1, 531.2, and 533 appear to synthesize the text of IGRA and the Department of Interior memorandum and represents the current guiding principles regarding essential terms and federal approval of management contracts.

[10]We note that the text of 25 U.S.C. § 2512 addresses review by the NIGC's Chairman of management contracts entered into "prior to the enactment of this Act [enacted Oct. 17, 1988], ... ." Strictly speaking there appears to be a gap in the NIGC's review authority for contracts entered after the passage of IGRA, but before the NIGC was completely organized (February 22, 1993). The management contract at issue in the present case, approved February 19, 1993, would fall within this gap period and apparently Lien has questioned the authority of the NIGC's review in this instance. The NIGC itself clearly believes it has review and approval authority over _any_ management contract approved by the Secretary, regardless of when the approval took place. Various correspondence by the agency to the parties bears this conclusion out. Tribes' appendix at 457-58; Lien appendix at 86-

12

the review process, many of the same criteria required for the Secretary's approval are examined by the Chairman of the NIGC. 25 U.S.C. § 2712(c)(1-2) (directing the Chairman to "subject [the existing] contract to the requirements and process of [25 U.S.C. § 2711]"). Again, a contract's approval by the Chairman depends on, inter alia, satisfactory background checks and compliance with the essential terms outlined in IGRA and the regulations. 25 C.F.R. §§ 533.6 (approval procedure), 533.3 (materials and documentation to be submitted when contract called in), 531.1(a-n) (denoting required essential contract terms).[11]

So while approval of a management contract, either by the Secretary of the Interior or the Chairman of the NIGC, entails a fairly comprehensive and exhaustive examination of the document and surrounding circumstances, in the end compliance with IGRA and the regulations is the sole focus. Has all of the proper documentation been submitted? Does the document contain provisions addressing the required essential topics? Do the backgrounds of "interested parties" check out? We essentially agree with Lien's assessment that "[t]he review is not more than a paper review to test the sufficiency of the documents submitted to the Secretary of the Interior in the first instance and to review whether the management agreement meets the required contents [specified under IGRA]." Appellant's Brief at 42. Despite the breadth of the approval and review process, passing on the legal validity of the document (as opposed to approval for a contract seemingly in compliance with IGRA and the regulations) is not within the scope of the administrative bodies.

---

87. We believe this issue is not before us, but note that a permissible agency interpretation
on this issue would merit considerable deference. Arkansas AFL-CIO v. FCC, 11 F.3d 1430, 1441 (8th Cir. 1993).

[11]It should be noted that during the NIGC's review process of contracts previously approved, all contracts approved by the Secretary of the Interior remain effective until approved or disapproved by the Chairman of the NIGC. 25 C.F.R. § 533.1(c).

C.  NIGC action in the present case

The NIGC called in the management contract at issue by letter to the parties on June 27, 1995.  All requested materials and documentation, including the contract itself, were submitted by the parties.  It was during the NIGC's review process that the Tribes sought to have the arbitration initiated by Lien postponed.  Failing that, the Tribes filed an action in Tribal Court believing a course enjoining the arbitration was required pending the completion of the NIGC's review.  The Tribal Court for the most part agreed and attempted to maintain the status quo until the review was complete or a ruling on the merits of the Tribes' complaint was achieved.  The District Court below as well relied heavily on the NIGC review in denying Lien's motion to compel arbitration.

After briefing was complete in the present appeal, the NIGC issued a letter dated May 17, 1996, to both parties indicating that the initial review of the management contract and the casino operation was completed.  This correspondence was made part of the present record pursuant to Fed.R.App.P. 28(j).  While the NIGC indicated that modifications to the contract were necessary for it to be in full compliance with IGRA,[12] the much-anticipated pronouncement said nothing regarding former Chairman Wilkinson's authority at the time the contract was executed, nor about whether or not a decision was forthcoming regarding the contract's legal validity.

---

[12]Deficiencies noted included the lack of a tribal gaming license for the Four Bears Casino, and the lack of background checks and licensing for certain "key employees" in the casino operation.  It is apparent the NIGC considers the deficiencies serious and threatened the parties with the full panoply of regulatory sanctions, including a shut down of the casino, if the deficiencies are not remedied.

To end all doubt as to its position on the issue, the NIGC sent a second letter to the parties on July 10, 1996, which states "the NIGC will not consider the authority of former Chairman Wilkinson to enter into the contract on behalf of the Tribe at this time since that question is properly before the tribal court ... ."

III.

So here we are.  These parties, initially associated for the purposes of mutual profit and well being, are now fighting it out on three fronts (tribal court, federal court, and the NIGC) over a number of issues, with perceptively little hope of a quick or inexpensive resolution.[13]  Two courts have this dispute on active status; the NIGC continues its review and continues in its attempt to bring the contract and gaming operation into compliance with IGRA; arbitrators, once chosen, presumably await notification that their activity is to resume.  The vessel which is the orderly administration of justice is leaking all over and making a big mess.

---

[13]We feel constrained to note the feelings of the District Court relative to the need for the parties, even at this late date, to resolve their differences.  We concur whole heartedly with the thoughtful observations of such Court.  Even at this advanced stage of the conflict, it is difficult to determine the underlying reason for this lawsuit.  Whether it is a matter of greed, stupidity, a lack of understanding of the legal responsibilities of the parties hereto, a combination of all three, or none of the above, is something only history will ultimately clarify.  One thing is certain, however, the dispute at present is only the tip of the iceberg.  More, much more, will come about by way of legal maneuvering unless there is more give and take on the part of both sides to this conflict.  Much is at stake here, including  employment for hundreds of people and the financial rewards to both sides of a successful business.  It is not beyond the realm of possibility that the business presently existing will be forced to close its doors.  The NIGC has noted such in its correspondence to the parties.  Having said this, it is our fervent hope that reason will prevail.

15

Our examination leads us to the conclusion that the underlying issues regarding the contract's validity must be resolved before any other matter can be productively addressed. We believe the District Court should have stayed its proceedings pending a resolution in the first instance in the Tribal Court of these matters.

In coming to this conclusion we start with the premise that civil jurisdiction over the activities of non-Indians on reservations lands presumptively lies in tribal courts, unless affirmatively limited by a specific treaty provision or federal statute. Iowa Mutual Ins. Co. v. LaPlante, 480 U.S. 9, 18, 107 S.Ct. 971, 977, 94 L.Ed.2d 10 (1987); Duncan Energy v. Three Affiliated Tribes, 27 F.3d 1294, 1299 (8th Cir. 1994). The exercise of tribal jurisdiction over activities of non-Indians is an important part of tribal sovereignty. Iowa Mutual, 480 U.S. at 18, 107 S.Ct. at 977. As noted in this court's decision in Duncan Energy:

> The Supreme Court has repeatedly recognized the Federal Government's long-standing policy of encouraging tribal self-government. See, e.g. Iowa Mutual Ins. Co. v. LaPlante, [supra, 480 U.S. at 14, 107 S.Ct. at 975-76], Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 138 n.5, 102 S.Ct. 894, 902 n.5, 71 L.Ed.2d 21 (1982). Tribal courts play a vital role in tribal self-government, and the federal Government has consistently encouraged their development. Iowa Mutual, 480 U.S. at 14-15, 107 S.Ct. at 975-76 .... The deference that federal courts afford tribal courts concerning [tribal-related] activities occurring on reservation land is deeply rooted in Supreme Court precedent. Because a federal court's exercise of jurisdiction over matters relating to reservation affairs can impair the authority of tribal courts, the Supreme Court has concluded that, as a matter of comity, the examination of tribal sovereignty and jurisdiction should be conducted in the first instance by the tribal court itself. National Farmers Union Ins. Co. v. Crow Tribe of Indians, 471 U.S. 845, 856, 105 S.Ct. 2447, 2453-54, 85 L.Ed.2d 818 (1985).

Duncan Energy, 27 F.3d at 1299.

Supreme Court precedent and this court's pronouncements based thereon require exhaustion of tribal court remedies in matters related to reservation affairs. Reservation Tel. Co-op. v. Affiliated Tribes, 76 F.3d 181, 184 (8th Cir. 1996) (citations omitted). Barring the presence of an exception to the exhaustion requirement[14], "a federal court should stay its hand in order to give tribal forums the initial opportunity to determine cases involving questions of tribal authority." Id., citing, Iowa Mutual, 480 U.S. at 15-16, 107 S.Ct. at 976-77. In this case many of the parties are Tribal entities or members and the dispute arises from Tribal governmental activity involving a project located within the borders of the reservation. Under these facts, exhaustion of tribal court remedies is especially appropriate. United States v. Turtle Mountain Housing Auth., 816 F.2d 1273, 1276 (8th Cir. 1987); Duncan Energy, 27 F.3d at 1300 (the court concluding it faced a "dispute arising on the Reservation that raises questions of tribal law and jurisdiction that should first be presented to the tribal court").

The Tribes below moved the District Court to dismiss Lien's federal action on the grounds of comity, arguing the federal court

---

[14]As enumerated in National Farmers Union, exhaustion of tribal remedies is not necessary where: (1) an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith; (2) the action is patently violative of express jurisdictional prohibitions; or (3) exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction. National Farmers Union, 471 U.S. at 856 n.21, 105 S.Ct. at 2454 n.21; See also, Reservation Tel., 76 F.3d at 184.

should defer to the Tribal Court pending exhaustion of tribal remedies of the questions regarding the contract's validity. The District Court apparently felt that exhaustion of tribal remedies was not required because IGRA divested said court of its jurisdiction. The Court noted:

> The management contract between the Tribes and the Lien Company is one authorized by Federal statutes, not Tribal Ordinance, and the Federal statutes prove that NIGC has exclusive jurisdiction for a first determination of compliance and validity. It appears that a finding by the Tribal Court that the management contract is void would itself be a nullity, but it is not necessary to reach that point at this time.

Lien v. Three Affiliated Tribes, No. A4-95-135, mem. and order nunc pro tunc at 7 (D.N.D. Nov. 9, 1995).

As previously indicated, we agree with the District Court's assessment that the NIGC has exclusive authority to determine a contract's compliance with IGRA and its regulations, but we disagree (as do both parties) that said agency has "exclusive jurisdiction" regarding a contract's legal validity. These are distinct inquiries, and the NIGC itself is on the record indicating that it will not resolve the issue of the contract's validity as the matter "is properly before the tribal court." Questions regarding whether IGRA or the NIGC divest the Tribal Court of authority to rule on the issues regarding the contract's validity, whether IGRA is applicable to the Tribal Court action, and whether the validity of the management contract can be affected by an interpretation of Tribal law, are issues relating to the Tribal Court's jurisdiction which should be dealt with first by the Tribal Court itself. Duncan Energy, 27 F.3d at 1299.

Lien argues that exhaustion is not required because the management contract requires that all disputes be resolved through arbitration and therefore mandates a limited role for the Tribal

18

Court.   Lien cites <u>FGS Constructors v. Carlow</u>, 64 F.3d 1230 (8th Cir. 1995), for the proposition that where a contract involving an Indian party contains a "choice of forum" clause, exhaustion of tribal remedies is not necessary.   In <u>Carlow</u>, the contract at issue contained a dispute resolution clause stating, "In the event there is any dispute between the parties arising out of this agreement, it shall be determined in the Ogalala Sioux Tribal Court or other court of competent jurisdiction."   <u>Id.</u> at 1233.   The district court had dismissed a Miller Act action brought in federal court on the ground of comity and failure to exhaust tribal court remedies.   <u>Id.</u> at 1232.   This court reversed that ruling, stating:

> We do not agree with the district court's determination that FGS must first exhaust its remedies in the tribal court.  The contracting parties agreed that a plaintiff could sue either in the federal district court of South Dakota (a court of competent jurisdiction) or in the tribal court.  By this forum selection clause, the Tribe agreed that disputes need not be litigated in tribal court.  The district court, therefore, had no significant comity reason to defer this Miller Act litigation first to the tribal court.

<u>Id.</u> at 1233.

The distinction between this case and <u>Carlow</u> is that in the present situation the Tribes are challenging the very validity of the agreement containing language giving the Tribal Court limited jurisdiction.   As previously indicated, we believe this entire litigation requires a logical focus which mandates the agreement's validity be addressed before all else.


Lien next argues that exhaustion is not required because IGRA has preempted the field of Indian gaming and serves to divest the Tribal Court of jurisdiction.   <u>See</u>, <u>Reservation Tel. Co-Op</u>, 76 F.3d at 184 (exhaustion not required where the tribal court action is "patently violative of express jurisdictional prohibitions") (citations omitted).   This argument is similar to the concerns raised by the District Court and must be similarly rejected for the

reasons articulated above.  While this circuit in the <u>Gaming Corp. of America</u> case has determined that IGRA is sufficiently comprehensive to preempt state law, <u>Gaming Corp. of America</u> says nothing regarding divesting tribal courts of jurisdiction regarding reservation affairs.

It is true that under certain circumstances, preemptive federal statutes may serve to relieve a party from exhausting tribal court remedies, <u>N.S.P. v. Prairie Island</u>, 991 F.2d 458, 463 (8th Cir. 1993), or may serve to "curtail[] the tribe's power to assert jurisdiction." <u>City of Timber Lake v. Cheyenne River Sioux Tribe</u>, 10 F.3d 554, 559 (8th Cir. 1993) (citations omitted).  These notions notwithstanding, it bears repeating that under the exhaustion doctrine, the tribal courts themselves are given the first opportunity to address their jurisdiction and explain the basis (or lack thereof) to the parties.  <u>National Farmers Union</u>, 471 U.S. at 857, 105 S.Ct. at 2454.  As a jurisdictional inquiry, appeal of this issue may be had in the federal district court.  <u>Duncan Energy</u>, 27 F.3d at 1300.

We reject the additional arguments raised by Lien against exhaustion, including the argument that the "bad faith" exception to the exhaustion requirement is implicated by the current set of facts.

Despite the foregoing, we agree with Lien and the District Court that federal question jurisdiction exists in the District Court.  While the issue of the contract's validity does not raise a federal question per se, certainly there are aspects of the dispute which do.  Particularly where the entire association between the parties (and their various disputes) arise under IGRA, and where the management agreement at issue, once approved, remains so until disapproved by the NIGC.  Further, this case is being directed to the Tribal Court and exhaustion within that system.  The existence of tribal court jurisdiction itself presents a

federal question within the scope of 28 U.S.C. § 1331. Iowa Mutual, 480 U.S. at 15, 107 S.Ct. at 976 (noting also that "[e]xhaustion is required as a matter of comity, not as a jurisdictional prerequisite"). As noted by the Supreme Court:

> Because petitioners contend that federal law has divested the Tribe of [civil jurisdiction], it is federal law on which they rely as a basis for the asserted right of freedom from Tribal Court interference. They have, therefore, filed an action 'arising under' federal law within the meaning of § 1331. The District Court correctly concluded that a federal court may determine under § 1331 whether a tribal court has exceeded the lawful limits of its jurisdiction.

National Farmers Union, 471 U.S. at 852-53, 105 S.Ct. at 2452.

IV.

Therefore we agree with the District Court that it has federal question jurisdiction and affirm as to that issue. That being said, it appears that the orderly administration of justice requires the District Court to stay its proceedings pending a determination by the Tribal Court of that court's jurisdiction and discussion regarding the legal validity of the management contract. We reverse the District Court's decision not to defer to the Tribal Court. Although we leave to the District Court's sound discretion decisions regarding further proceedings in that court, we note that the rare circumstances of this case make time of the essence. The exhaustion process should be given a reasonable time to proceed, but the District Court may wish to consider lifting the stay if satisfied that undue delays detrimental to either party are attending the tribal court exhaustion process.[15,16]

---

[15]The Tribes have also asserted the district court erred in failing to dismiss Lien's federal action on the grounds of sovereign immunity. Because we are reversing the district court's decision on the grounds of comity and failure to exhaust tribal court remedies, which is presently dispositive of the case, we decline to reach the sovereign immunity issue.

[16]Given our disposition of this matter, we believe that all matters decided by the District Court, but not referenced in the current opinion, are mooted by the same. Considering that the

21

We remand for proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

matter is going back to her court for consideration, we specifically affirm the District Court's dismissal of Tribal Judge Avery as party defendant.