### AT & T CORP., Plaintiff–Counterdefendant,

v.

### COEUR D'ALENE TRIBE, Defendant–Counterplaintiff.

### No. CV97–392–N–EJL.

United States District Court,
D. Idaho.

Dec. 17, 1998.

John C. Judge, Landeck Westberg Judge & Graham, Moscow, ID.

Howard Spierer, AT & T Office of the Solicitor General, Liberty Corner, NJ.

Raymond C. Givens, Givens & Funke, Coeur d'Alene, ID. Michael R. Shebelskie, Hunton & Williams, Richmond, VA.

Patricia M. Schwarzschild, Hunton & Williams, Richmond, VA.

Jonathan A. Glogau, Office of Attorney General, Tallahassee, FL. Alan I. Gilbert, Office of Attorney General, St. Paul, MN.

## MEMORANDUM DECISION AND ORDER

LODGE, District Judge.

### Introduction

In an effort to facilitate participation in the National Indian Lottery (the "Lottery") the Coeur d'Alene Tribe of Idaho asked AT & T Corporation to provide toll-free interstate telephone service ("800 Service") between the Coeur d'Alene Indian Reservation, in Idaho and 33 states, plus the District of Columbia. Citing the authority granted by 18 U.S.C. § 1084(d), the Attorneys General of numerous states informed AT & T that furnishing interstate 800 Service for the Lottery would violate various federal and state laws, and requested that AT & T refuse to provide the 800 Service to the Tribe (the " § 1084(d) Notices"). In response to the § 1084(d) Notices, AT & T advised the Tribe that it could not provide 800 Service for the Lottery in any other jurisdiction than Idaho until "all legal differences between the State Attorneys General and the Coeur d'Alene Tribe" had been resolved.

The Tribe then initiated a legal action in the Coeur d'Alene Tribal Court, requesting both a declaration that the Lottery was legal and a permanent injunction prohibiting AT & T from denying 800 Service to the Tribe. On February 28, 1996, the Tribal Court entered an Order that granted summary judgment in favor of the Tribe and denied AT & T's motion to dismiss the lawsuit. The Coeur d'Alene Tribal Appellate Court subsequently affirmed the Tribal Court's decision.

On August 22, 1997, AT & T filed a Complaint in this Court alleging that the Tribal Court lacked the authority to adjudicate the dispute (Counts I, II, and III) and, in the alternative, that the Tribal Court's decision was erroneous as a matter of law (Count IV). AT & T also seeks a declaratory judgment to establish its rights and duties with respect to the Tribe's request for 800 Service and the § 1084(d) Notices (Count V). The Tribe answered and counterclaimed. In Count I of the Counterclaim the Tribe requests a declaratory judgment affirming the validity of the Tribal Court's Order. In Count II the Tribe seeks a declaratory judgment pronouncing the Lottery legal in all respects and a permanent injunction requiring AT & T to furnish interstate 800 Service in connection with the Lottery.

The Tribe now moves for partial summary judgment on Count V of AT & T's Complaint and on Count II of the Tribe's Counterclaim, contending it is entitled to judgment as a matter of law in respect to a declaration that the Lottery is legal and an injunction that requires AT & T to provide the Tribe with 800 Service. AT & T moves on a cross-motion for summary judgment for an order reversing the Order of the Tribal Court, pursuant to Counts I, II and III of the Complaint. Jurisdiction over this action is proper under 28 U.S.C. § 1331 and 28 U.S.C. § 2201. Having heard oral argument on this matter [1], and having reviewed the record and controlling law, the Court rules as follows.

## DISCUSSION

### I

#### A. Background

The Court first considers whether the Tribe is entitled to summary judgment on its motion. Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *Sum-*

---

1. Nineteen states were granted leave to appear as *amicus curiae,* submit an *amicus curiae* brief in response to the Tribe's motion for partial summary judgment, and participate, through one representative, in oral argument on the merits of the motion.

*mers v. A. Teichert & Son, Inc.,* 127 F.3d 1150, 1152 (9th Cir.1997). The material facts, as recounted below, are not in dispute.

In accordance with the procedures set forth in the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 *et seq.,* the Tribe and the State of Idaho entered into a compact that permits the Tribe to conduct a lottery. The Secretary of Interior approved the compact ("Coeur d'Alene Tribe/Idaho Compact") and published his approval in the Federal Register, Relying on the authority provided by the compact, the Tribe established the National Indian Lottery.[2] As required by IGRA, the Tribe submitted to the Chairman of the National Indian Gaming Commission ("NIGC") for his review a management agreement detailing the intended operation of the Lottery. The Chairman approved the Tribe's management agreement and business plan.

The Tribe, through its managing agent, Unistar Entertainment, Inc. ("Unistar"), began operating the Lottery in January of 1998. Participants in the Lottery purchase chances and, at their option, either select or are randomly assigned a sequence of numbers for each chance purchased. The funds obtained through the sale of chances, less certain deductions, constitute the prize pool. At a weekly drawing, a sequence of numbers is randomly drawn as the "winning numbers." The operations used to select the winning numbers, including the computer and associated software, are located on the Coeur d'Alene Indian Reservation (the "Reservation").

Players who wish to purchase chances in the Lottery can do so in person or by telephone. Before the Tribe will accept an order by telephone, the player must establish an account with the Tribe on the Reservation. A player may fund the account either by credit card authorization or by otherwise delivering to the Tribe proceeds to be deposited into the account. The purchase price of any telephone order is debited from the account maintained in the player's name by the Tribe on the Reservation. If requested, a player will receive written confirmation of the transaction. Any winnings are credited to the player's account. Players can retrieve funds from their accounts by sending instructions to the Tribe to distribute the proceeds.

Prior to the initiation of this lawsuit, the Tribe, through Unistar, asked AT & T to provide 800 Service for the purpose of linking the reservation to the 33 states, plus the District of Columbia, that conduct state sponsored lotteries. In its request, the Tribe acknowledged that "the [toll-free] telephone number will be used ... for lottery wagering." (Exs. in Supp. of Tribe's Mot., Ex. Q).

The Federal Communication Act imposes a general obligation on every telephone company engaged in interstate communications to provide service upon reasonable request. 47 U.S.C. §§ 201(a), 202(a). An exception to this general obligation is set forth in 18 U.S.C. § 1084(d). That statutory provision provides in relevant part:

> When any common carrier ... is notified in writing by a Federal, State, or local law enforcement agency, acting within its jurisdiction, that any facility furnished by it ... will be used for the purpose of transmitting or receiving gambling information in interstate ... commerce in violation of Federal, State, or local law, it shall ... refuse, the ... furnishing ... of such facility.

Pursuant to § 1084(d), Attorneys General from at least 10 states gave notice to AT & T that furnishing 800 Service for the Lottery would violate both federal and state laws. In reliance on the § 1084(d) Notices, AT & T informed the Tribe that it could not provide 800 Service in connection with the Lottery. Subsequently, the Tribe successfully pursued a legal action against AT & T in Tribal Court, obtaining a permanent injunction that prohibits AT & T

---

**2.** This case involves only the "Pick Six" component of the National Indian Lottery.

from denying the Tribe 800 Service. AT & T then initiated the present action, seeking, *inter alia,* a declaration as to its rights and duties in regards to the Tribe's request for 800 Service and the § 1084(d) Notices.

## B.  Effect of the § 1084(d) Notices

▉ The Tribe contends that the § 1084(d) Notices are not valid and therefore AT & T is not bound to honor the demands by the Attorneys General that AT & T refuse the Tribe 800 Service. In this regard, the Tribe argues that a valid notice under § 1084(d) must issue from a law enforcement agency "acting within its jurisdiction." The Tribe notes that the § 1084(d) Notices are based in part on the assertion that the Lottery is unlawful under federal law in violation of 18 U.S.C. §§ 1301, 1302 and 1304, and 18 U.S.C. § 1084(a). Observing that "nothing in the federal code authorizes state attorneys general to prosecute alleged violations of the federal criminal statutes," the Tribe contends the § 1084(d) Notices are invalid with respect to the purported violations of federal law. (Tribe's Br. in Supp. at 10–11 & n. 5).

Section 1084(d) does not "create[ ] an offense of transmitting or receiving gambling information in interstate or foreign commerce." *Telephone News System, Inc. v. Illinois Bell Tel. Co.,* 220 F.Supp. 621, 625 (N.D.Ill.1963), *aff'd* 376 U.S. 782, 84 S.Ct. 1134, 12 L.Ed.2d 83 (1964). Instead, the determination of whether an offense has been committed "is to be determined by reference to federal, state, and local criminal laws which proscribe the sending or receiving of gambling information." *Id.* For this reason, and in accordance with the express language of the statute, a notice is valid under § 1084(d) only if it has been issued by the "agencies charged with enforcement" of the relevant federal or state statute. *See id.*

All the § 1084(d) Notices received by AT & T in this case were sent by Attorneys General charged only with the enforcement of state law. The Notices, therefore, are invalid to the extent they allege a violation of the federal criminal statutes. *Id.* Thus, the § 1084(d) Notices are effective, if at all, to preclude 800 Service only in instances where the Lottery violates a law of the state issuing the Notice.

The fact that the § 1084(d) Notices are only valid to notify AT & T of possible state law violations necessarily circumscribes the scope of the Court's inquiry. Federal courts are limited to declaring "the rights and other legal relations of parties to a case of actual controversy." *Spokane Indian Tribe v. United States,* 972 F.2d 1090, 1091 (9th Cir.1992) (quoting 28 U.S.C. § 2201). Here, there is nothing in the record to establish that the authority charged with enforcement of the federal criminal statutes will issue a § 1084(d) Notice to AT & T in the immediate future. Consequently, there is no "real and reasonable apprehension that [AT & T] will be subject to liability" under any federal statute, and therefore there is no "justiciable case or controversy" that is "of sufficient immediacy and reality to warrant issuance of a declaratory judgment" with regard to this matter. *Id.* at 1092. The Court, then, is necessarily confined to a determination of AT & T's obligations under the § 1084(d) Notices with respect to state law only.[3] *Cf. id.*

On this issue, and as explained more completely below, the Court finds that to the extent the Tribe's gaming activities occur outside the limits of the Reservation IGRA does not preempt state law. Furthermore, reference to principles of federal common law governing state and tribal relationships demonstrate that the states are not preempted from applying their laws to those aspects of the Lottery that

---

**3.** Given the Court's ruling it will not address the Tribe's argument that the Lottery does not violate federal criminal statutes 18 U.S.C.

§§ 1301, 1302 and 1304, and 18 U.S.C. § 1084(a).

occur off the Reservation and within the jurisdiction of the affected states. Finally, the Court agrees with recent cases that find the Commerce Clause does not prohibit a state from enforcing its anti-lottery laws. Accordingly, the Court concludes that the § 1084(d) Notices are effective to preclude 800 Service to those states where in fact the operation of the Lottery off Indian lands would violate state law.

### C. IGRA Does Not Preempt State Law

■ The Tribe contends that whether or not a state statute prohibits the Lottery is immaterial because state law is preempted by the operation of IGRA. The Tribe's contention is correct so far as it goes. There is little doubt that IGRA preempts state laws that purport to prohibit or to regulate Indian gaming. *See, e.g., Cabazon Band of Mission Indians v. Wilson,* 124 F.3d 1050, 1059 (9th Cir.1997) (hereinafter, *"Wilson II "), cert. denied,* —— U.S. ——, 118 S.Ct. 2319, 141 L.Ed.2d 694 (1998); *Cabazon Band of Mission Indians v. Wilson,* 37 F.3d 430, 433–35 (9th Cir.1994) (hereinafter, *"Wilson I "); Gaming Corp. of Am. v. Dorsey & Whitney,* 88 F.3d 536, 543–48 (8th Cir. 1996). The scope of this preemption, however, is limited to the reach of IGRA, and that statute only concerns Indian gaming that occurs on *Indian lands. See, e.g., Wilson I,* 37 F.3d at 433–35 (explaining that IGRA preempts "a state's authority to regulate activities *on tribal lands "* (emphasis added)); *Whitney,* 88 F.3d at 543–48 (deciding that IGRA "completely preempts state laws regulating gaming *on Indian lands "* (emphasis added)); *Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685, 689 (1st Cir.) (explaining that IGRA "is an expression of Congress's will in respect to the incidence of gambling activities *on Indian lands "* (emphasis added)), *cert. denied,* 513 U.S. 919, 115 S.Ct. 298, 130 L.Ed.2d 211 (1994).

The language of IGRA makes clear that the preemptive scope of the statute is limited to gaming that occurs on Indian lands. Section 2701(3) of IGRA pronounces that the Act is necessary because Congress "finds ... existing Federal law does not provide clear standards or regulations for the *conduct of gaming on Indian lands."* 25 U.S.C. § 2701(3) (emphasis added). Similarly, § 2702(3) declares that a purpose of the Act is to establish "independent Federal regulatory authority for gaming *on Indian land."* 25 U.S.C. § 2702(3) (emphasis added). Most important, where certain conditions have been met, IGRA allows that "gaming activities" associated with class III gaming (which includes the operation of a lottery) "shall be lawful *on Indian lands "* in a State that permits such gaming.[4] 25 U.S.C. §§ 2710(d)(1), (d)(1)(B), (d)(3)(A) (emphasis added). The Tribe's preemption argument succeeds, therefore, only if the gaming activities that constitute the Lottery occur on "Indian lands."

■ In order to determine whether the Tribe's Lottery activities occur on Indian lands, and therefore fall within the preemptive scope of IGRA, the Court must look to the statute. *Greyhound Corp. v. Mt. Hood Stages, Inc.,* 437 U.S. 322, 330, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978) ("The starting point in every case involving construction of a statute is the language itself."). "If the intent of Congress is clear, that is the end of the matter; for the court... must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In determining the clear or plain meaning of a statute, the Court "look[s] not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997,

---

4. There is no question that under IGRA a lottery is classified as class III gaming. *Spo-*

*kane Indian Tribe,* 972 F.2d at 1093–95.

108 L.Ed.2d 132 (1990); *see also King v. St. Vincent's Hosp.*, 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) ("[A] statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context.").

Relevant to the Court's inquiry, IGRA defines "Indian lands" as "all lands within the limits of any Indian reservation." 25 U.S.C. § 2703(4)(A).[5] And, as mentioned above, the statute permits the operation of a lottery when, among other requirements, the "gaming activities" occur on Indian lands. Thus, under the plain language of the statute the gaming activities that constitute the Lottery must occur on lands within the limits of the Reservation. *See* 25 U.S.C. § 2710(d)(1).

The statute does not define the term "gaming activities." In the absence of a statutory definition, the Court "must assume that the 'legislative purpose is expressed by the ordinary meaning of the words used.'" *Spokane Indian Tribe*, 972 F.2d at 1093 (explaining proper method of interpreting an undefined term that appears in IGRA); *see also United States v. Akintobi*, 159 F.3d 401, 403 (9th Cir.1998) ("In the absence of a statutory definition, 'words will be interpreted as taking their ordinary, contemporary, common meaning.'"). Webster's defines "activity" as an "actuating force" or "normal function" of a

"process." Webster's Third New International Dictionary, 22 (1981). Consistent with this definition, it is evident that an "activity" material to the Lottery's operation necessarily includes the act of ordering a chance.[6] *See, e.g., United States v. Wallis*, 58 F. 942 (D.Idaho 1893) (explaining that at a minimum, a lottery "embraces the elements of *procuring* through lot or chance, by the investment of a sum ·of money or something of value, some greater amount of money or thing of greater value" (emphasis added)). But for the act of placing the "lottery wager," a player could not participate in, and the Tribe could not operate, the Lottery. This point is virtually conceded by the Tribe when it asserts that "a toll-free number is critical to the economic viability of the National Indian Lottery." (Tribe's Statement of Uncontested Facts at ¶ 19). The Tribe's effort to obtain 800 Service so that a player can order chances while outside the limits of the Reservation would have the effect of maintaining a gaming activity off Indian lands and, consequently, take the Lottery outside the protective preemption provided by IGRA.[7]

The Court's conclusion is bolstered by "the design of the statute as a whole and . . . its object and policy." *See Crandon*, 494 U.S. at 158, 110 S.Ct. 997. Indeed,

---

5. Under the statute's definition, trust lands and restricted lands, subject to tribal jurisdiction, also are Indian lands. 25 U.S.C. § 2703(4)(B).

6. Canons of statutory construction direct a court to resort to common law principles only when the term being construed is itself defined through common law concepts. *See Rendleman v. Bowen*, 860 F.2d 1537, 1541–42 (9th Cir.1988). As the Webster's definition demonstrates, "activity" is not a conduit for the incorporation into IGRA of common law contract principles. Although Congress certainly could have limited the "on Indian lands" requirement by reference to common law contract principles, it chose instead to require that all gaming "activities" occur on Indian lands. For this reason, the Tribe's discussion of offer, acceptance and consideration is simply not relevant. *Id.*

7. The Tribe insists that in *Wilson I* the Ninth Circuit construed IGRA in a manner that is inconsistent with this conclusion. The discussion from *Wilson I* that the Tribe points to, however, concerns the Ninth Circuit's analysis of a tribal gaming operation in relation to non-IGRA cases. 37 F.3d at 434–35 (stating that in "assessing the Bands' interests, we also must consider the nature of the taxed activity" and citing non-IGRA cases). *Wilson I* did not consider or decide whether a particular activity was a "gaming activity" under IGRA. But, in any event, it was expressly noted in *Wilson I* that with regard to the gaming operation at issue, "the betting occurs *on Indian land.*" *Id.* at 435 (emphasis added).

policy considerations underpinning the design of IGRA permit the Court to reach no other conclusion. Prior to enactment of IGRA, "Indian tribes were immune from state criminal and regulatory jurisdiction except to the extent that they consented to be governed by it." *Wilson II*, 124 F.3d at 1060. The tribes' immunity in this respect derives directly from the sovereign power the tribes enjoy over "both their members and *their territory.*" *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) (emphasis added). In enacting IGRA, Congress "attempted to accommodate the interest of the Indian tribes with the legitimate regulatory interests of the states." *Confederated Tribes of Siletz Indians of Oregon v. United States*, 110 F.3d 688, 693 (9th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 625, 139 L.Ed.2d 606 (1997). Under IGRA, before a tribe can conduct class III gaming on Indian lands the tribe is required to "request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal–State compact governing the conduct of gaming activities." 25 U.S.C. § 2710(d)(3)(A). Typically, a tribal-state compact provides for limited state regulation of the class III gaming activity. *See, e.g., Wilson II*, 124 F.3d at 1060 ("The mechanism for facilitating the unusual relationship in which a tribe might affirmatively seek the extension of State jurisdiction and the application of state laws to [gaming] activities conducted on Indian land is a Tribal–State compact." (quoting the Senate Committee on Indian Affairs)). Thus, IGRA anticipates the extension of state jurisdiction to Indian lands for the purpose of regulating class III gaming, but "IGRA limits the state's regulatory au-

thority to that expressly agreed upon in a compact." *Id.* at 1059.

It is apparent, then, that by conducting part of the gaming activities that constitute the Lottery in a state other than Idaho, the Tribe cannot fit its class III gaming within the statutory structure of IGRA. Through the use of the 800 Service, citizens of 33 states, plus the District of Columbia, could participate in the Lottery even though the Tribe and affected states had not entered into a compact. IGRA does not contemplate that a tribe's class III gaming operation can be operated in a state without first addressing, through the negotiation of a compact, that state's legitimate interest in regulating gaming activities within its borders. *See, e.g.,* 25 U.S.C. §§ 2710(d)(1)(C), (D)(3)(A); *Spokane Indian Tribe*, 972 F.2d at 1095 (explaining that a 1988 amendment to IGRA "was designed to clarify that Indian tribes could not operate a statewide lottery without a tribal-state compact"). The Tribe's interjection of gaming activities into states with which it has no compact, upsets the balance Congress struck in IGRA between "the need for state enforcement of gaming laws [and] the federal and tribal interests in traditional tribal sovereignty," *Wilson II*, 124 F.3d at 1060, thereby confirming that the Lottery falls outside the preemptive scope of IGRA.[8]

Although the Court does not find it necessary to resort to legislative history, reference to that source confirms that Congress did not intend for IGRA to apply to class III gaming when a portion of the gaming activities occurs outside the limits of a reservation. In this regard, Congress considered the possibility that gaming activities might occur in more than one location, "in the same or different States" and

---

**8.** If follows from the discussion above, that it may be possible under IGRA for tribes in several states to jointly operate an interstate lottery. But, if permitted at all, it would be necessary for all the gaming activities associated with such a lottery to occur on Indian lands and only after the participating tribe within each state had satisfied the compact

procedure outlined in the statute. *See, e.g.,* 25 U.S.C. §§ 2710(d)(1), (d)(1)(B)–(C), (d)(3)(A). In this manner, the interests of both the tribes and affected states would be addressed as required by IGRA. The Court, of course, does not decide whether IGRA in fact permits such a lottery scheme.

be linked together "by means of telephone, cable, television or satellite." *Sycuan Band of Mission Indians v. Roache*, 54 F.3d 535, 542 (9th Cir.1994) (quoting Senate Committee Report), *cert. denied*, 516 U.S. 912, 116 S.Ct. 297, 133 L.Ed.2d 203 (1995). But in all instances, Congress was careful to note that the activities associated with such a gaming operation must occur on the "various reservations."[9] *Id.* Congress' discussion on this point is not surprising given that the language of IGRA makes it plain that a tribe's gaming activities must occur on Indian lands.

In sum, the language, design and object of the statute demonstrate that the Lottery is not protected by the preemptive effect of IGRA. Despite this conclusion, the Tribe argues that the Court must defer to the decision rendered by the Secretary of Interior when he approved the Coeur d'Alene Tribe/Idaho Compact, and the decision of the Chairman of the NICG when he approved the management contract, that the Lottery comports with the requirements of IGRA. However, the Secretary did not approve of the Lottery when he approved the compact, because the Coeur d'Alene Tribe/Idaho Compact does not discuss the Lottery. The compact allows that a lottery "shall not be subject to any State restrictions, including ... interstate aspects of the permitted games," but then goes on to qualify this statement by providing that "this section is not intended to permit gaming except on Indian lands." (Exs. in Supp. of Tribe's Mot., Ex. B at 9–10). Read in whole, the compact, at best, anticipates an interstate lottery where *all* the gaming activities occur on Indian lands. Thus, the Secretary did not approve of a lottery, such as the Tribe's, where gaming activities occur out-of-state and off reservation.

Unlike the Secretary, the Chairman reviewed documents, including the management agreement and business plan, that showed the Lottery's operation would include gaming activities in other states and outside the limits of any reservation. Nevertheless, he approved the management agreement. In a letter dated September 21, 1995, the Chairman states:

> In the opinion of the NICG, the Tribe's lottery proposal, which involves customers purchasing lottery tickets with a credit card ... by telephone from locations ... outside the State of Idaho, is not prohibited by the IGRA.

(Exs. in Supp. of Tribe's Mot., Ex. H).

■ In the usual case, a court should give deference to an agency's interpretation of a statute that it administers. *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778. That principle extends to a decision of the Chairman, but the deference given is slight when the Chairman's decision is not the product of an adjudication or rulemaking. *Miami Tribe of Oklahoma v. United States*, 5 F.Supp.2d 1213, 1216 (D.Kan. 1998). In this case the Chairman's "review [of the management agreement] is no more than a paper review to test the sufficiency of the documents submitted ... and to review whether the management agreement meets the required contents specified under IGRA." *Bruce H. Lien Co. v. Three Affiliated Tribes*, 93 F.3d 1412, 1418 (8th Cir.1996). Moreover, the Chairman's opinion is unsupported by any analysis that displays the underlying reasoning for the decision. *See Brock v. Louvers & Dampers, Inc.*, 817 F.2d 1255, 1258 (6th Cir. 1987) ("Unexplained agency constructions have little persuasive value."); *S.E.C. v. Sloan*, 436 U.S. 103, 118, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978) (same). And, in any event, "no deference is due if Congress has spoken directly to the question." *Passamaquoddy Tribe v. State of Maine*, 75 F.3d 784, 793 (1st Cir.1996) (declining to defer to Chairman's interpretation of IGRA when that interpretation was contrary to unambiguous expression of con-

---

9. The possibility that class III gaming would be conducted between the "various reservations" apparently lead Congress to exempt

IGRA gaming from the proscriptions contained in 18 U.S.C. §§ 1301, 1302.

gressional intent). As explained above, here Congress has unambiguously indicated that IGRA applies only to gaming activities that occur on Indian lands.

Finally, citing the Ninth Circuit's *Wilson II* decision, the Tribe asserts that IGRA operates to preempt state law even if the Lottery "violates IGRA." The Tribe misreads *Wilson II*. That case stands for the proposition that when class III gaming occurs *on Indian lands* IGRA applies and preempts a state's ability to regulate the gaming activity even though the class III gaming violates a tribal-state compact. *See Wilson II*, 124 F.3d at 1059–60 (explaining · that under IGRA "the State lacked jurisdiction · to enforce its criminal laws against class III gaming activities *on tribal lands* unless the tribe has consented to the transfer to the State of criminal jurisdiction pursuant to a Tribal–State compact" (emphasis added)). In contrast to the gaming operation.at issue in *Wilson II*, the Lottery does not "violate" IGRA, it simply is not covered by that·statute to the extent its operations occur off reservation. *See Whitney*, 88 F.3d at 543 n. 8 (recounting cases where Indian gaming fell "outside the scope of any preemption" under IGRA). As discussed above, a class III gaming operation fits within the statutory umbrella provided by IGRA if, and only if, the gaming activities occur on Indian lands.

*D. State Law Is Not Otherwise Preempted*

Without the preemptive effect of IGRA, the states may regulate tribal activity to the extent allowed under· principles of federal common law. No surprisingly, the principles applicable to this case have been incorporated by Congress into IGRA and are consistent with the balance struck in that statute between the state interests on the one hand, and tribal sovereignty on the other. Specifically, states are generally precluded from prohibiting or regulating tribal gaming that occurs on tribal lands, absent tribal consent. *See Cabazon Band*

*of Mission Indians,* 480 U.S. at 207, 107 S.Ct. 1083. This principle is grounded on the recognition "that Indian tribes retain attributes of sovereignty over both their members and their territory." *Id.* In contrast, when tribal activities extend beyond reservation boundaries and involve nonmembers, the state is generally free to regulate the activity. "Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148–49, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973). In IGRA, Congress endorsed these distinctions and expressly protected Indian gaming from state regulation only where the gaming activity is conducted on Indian lands.

■ The Tribe contends, however, that the state laws at issue violate the Interstate Commerce Clause and the dormant Commerce Clause. This same argument was considered and rejected by the Third Circuit in *Pic–A–State Pa., Inc. v. Reno,* 76 F.3d 1294, 1298, 1300–04 (3rd Cir.), *cert. denied,* 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996). The Court finds the reasoning of that case persuasive, and adopts it as its own. That portion of the Lottery that is conducted off the Reservation and in a state other than Idaho is not exempted from or protected by any federal statute, and therefore federal law allows states to regulate Lottery operations that are conducted within the jurisdiction of the affected states. *See id.*

■ Because the Tribe's Lottery consists of gaming activities that occur out-of-state and outside the limits of any reservation, state law applies to regulate that conduct. Therefore, the § 1084(d) Notices are valid to the extent the state giving notice prohibits the gaming activities associated with the Tribe's Lottery. Accordingly, the Court will deny the Tribe's motion for partial summary judgment.

In reaching its decision, the Court also has determined the scope of the declaratory relief AT & T is entitled to under Count V of the Complaint: AT & T is not required to furnish 800 Service to any state that provides AT & T with a § 1084(d) Notice, where the operation of the Tribe's gaming activities within the jurisdiction of that state would violate state law. Whether or not the Lottery in fact violates as state's law is, of course, a question of state law that must be determined by a state court in a proceeding where all the necessary parties have been joined.

## II

In its cross-motion, AT & T asks the Court to reverse the Order of the Tribal Court because the Tribal Court lacked authority to adjudicate the dispute. Given the Court's ruling in regards to the Tribe's motion, the Court finds that AT & T's motion is moot. It matters not whether the Tribal Court properly exercised its authority because in any event the Order of that court is erroneous as a matter of federal law.

"[F]ederal courts are the final arbiters of federal law." *FMC v. Shoshone–Bannock Tribes,* 905 F.2d 1311, 1314 (9th Cir.1990), *cert. denied,* 499 U.S. 943, 111 S.Ct. 1404, 113 L.Ed.2d 459 (1991) (holding that where tribal court resolves a question of federal law, the federal court should review the decision *de novo* ).[10] The Tribal Court wrongly concluded that the statutory provisions of IGRA applied to the Tribe's Lottery. Consequently, the Tribal Court's mistaken legal conclusion resulted in an Order that is null and void.

Although pled in the alternative as a ground for relief in Count IV of the Complaint, AT & T did not formally base its cross-motion for summary judgment on the erroneous ruling of the Tribal Court. However, the issue was raised in the parties' briefs and discussed during oral argument. (*See, e.g.,* AT & T's Br. in Opp'n at 20). Similarly, the issues present by the Tribe's partial motion for summary judgment involve the same legal questions adjudicated by the Tribal Court. Thus, the parties had a "full and fair opportunity to ventilate the issues." *Cool Fuel, Inc. v. Connett,* 685 F.2d 309, 311 (9th Cir.1982). Because the Court concludes "that there is no genuine dispute respecting a material fact essential to the proof of [Count IV]," *id.,* the Court will sua sponte grant summary judgment in favor of AT & T on Count IV of the Complaint, and declare the Tribal Court Order null and void and unenforceable on the ground that the Order is erroneous as a matter of law.

## ORDER

Based on the foregoing, and the Court being fully advised in the premises, it is **HEREBY ORDERED** that:

1. The Coeur d'Alene Tribe/Idaho's Motion for Partial Summary Judgment on Count II of the Counterclaim and Count V of the Complaint is **DENIED.**

2. The Coeur d'Alene Tribe/Idaho's Counterclaim is **DENIED.**

3. AT & T Corporation's Cross–Motion for Summary Judgment on Counts I, II and III of the Complaint is **DENIED** as moot.

4. Summary judgment on Count IV of the Complaint, pled in the alternative to Counts I, II and III of the Complaint, is **GRANTED** in favor of AT & T Corporation and the Court hereby **DECLARES** that the Order of the Coeur d'Alene Tribal Court issued February 28, 1996, is null and void and unenforceable on the ground that the Order is erroneous as a matter of law.

5. The Court **GRANTS** the declaratory relief requested by AT & T Corporation in

10. In contrast, where a tribal court resolves a legal dispute involving only questions of local law, and federal jurisdiction is predicated on the diversity of the parties, a federal court may be limited in its ability to reconsider the tribal court's ruling. *See Iowa Mutual Ins. Co. v. LaPlante,* 480 U.S. 9, 19, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987).

Count V of the Complaint as follows: AT & T Corporation is not required to furnish the Coeur d'Alene Tribe of Idaho with toll-free interstate service to any state that provides AT & T Corporation with a notice in accordance with 18 U.S.C. § 1084(d), where the operation of the Pick Six component of the National Indian Lottery within the jurisdiction of that state would violate state law.