**AT & T CORPORATION,**
Plaintiff–Appellee,

v.

**COEUR D'ALENE TRIBE,**
Defendant–Appellant.

No. 99–35088.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 7, 2000.

Filed March 19, 2002.

Amended July 17, 2002.

Raymond Givens, Coeur d'Alene, ID, for the defendant-appellant.

Howard Spierer, Basking Ridge, NJ, for the plaintiff-appellee.

Alan I. Gilbert, St. Paul, MN (States), and Corbin Weiss, Washington, DC (USA), for the amici curiae.

Before: BROWNING, B. FLETCHER and GOULD, Circuit Judges.

Opinion by Judge B. FLETCHER; Partial Concurrence and Partial Dissent by Judge GOULD.

### ORDER

The opinion of this court filed March 19, 2002, 283 F.3d 1156, slip op. at 4411, is amended as follows:

On page 4421 [283 F.3d at 1161] of the slip opinion, in the first full paragraph, delete the sentence beginning "This is no less true ..." and the accompanying citations to *El Paso Natural Gas Co. v.*

*Neztsosie* [526 U.S. 473, 119 S.Ct. 1430, 143 L.Ed.2d 635 (1999)] and *Santa Clara Pueblo v. Martinez* [436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978)]. On page 4422 [283 F.3d at 1162] of the slip opinion, delete the second sentence of the second full paragraph and its accompanying citation. Insert in its place the following: "Subject to a number of exceptions, tribal courts ordinarily have the first opportunity to determine the extent of their own jurisdiction." Add the following footnote at the end of the sentence: *See Nevada v. Hicks,* 533 U.S. 353, 369, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001).

On page 4422 [283 F.3d at 1162] of the slip opinion, delete the last sentence of the second full paragraph. Insert in its place the following: "We need not decide whether exhaustion was required in this case or if any of the exceptions to exhaustion applied, because the tribal court did in fact have the first opportunity to determine the extent of its jurisdiction; thus, whether exhaustion was required or not, the issue of tribal jurisdiction is ripe for review."

On page 4422 [283 F.3d at 1162] of the slip opinion, delete the paragraph beginning "In the absence of Congressional action, ..."

## OPINION

BETTY B. FLETCHER, Circuit Judge:

Having received conflicting determinations from tribal courts and the federal district court, the Coeur d'Alene Tribe appeals the district court's determination that AT & T Corporation need not provide toll-free telephone service for the Tribe's lottery. We find that the tribal court lacked jurisdiction to resolve the dispute, but vacate the district court's determination that the lottery itself is illegal under the Indian Gaming Regulatory Act (IGRA). We conclude that AT & T was not the proper party to challenge the legality of the lottery.

## I. BACKGROUND

The federally recognized Coeur d'Alene Tribe ("Tribe") resides on the Coeur d'Alene Reservation in Idaho. Federal law permits tribes like the Coeur d'Alene to engage in gambling activities on Indian lands pursuant to the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 *et seq.* As IGRA requires of any tribe wishing to engage in gambling on its land, the Tribe entered into a compact with the State of Idaho. The compact permits the Tribe to offer Class III gaming, including a lottery. *See* 25 U.S.C. § 2710(d)(3). The Secretary of the Interior approved the compact. *See* 25 U.S.C. § 2710(d)(8); 58 Fed.Reg. 8478 (1993).

The Tribe created the National Indian Lottery ("Lottery"). The Lottery's administration occurs entirely on the Reservation. However, off-Reservation participants may purchase tickets by telephone from outside Idaho.[1] In order to participate in the Lottery, an off-Reservation player establishes an account on the Reservation and funds it either by credit card or by delivering funds. To purchase a ticket, the player authorizes a deduction from the account and either selects a sequence of numbers or requests randomly

---

1. The Lottery also permits persons outside the reservation to purchase tickets over the Internet. This aspect of the Lottery is subject to litigation in the Eighth Circuit and the Missouri state courts. The Eighth Circuit has remanded to the district court to determine whether the Lottery is a gaming activity on Indian lands subject to IGRA. *State ex rel. Nixon v. Coeur D'Alene Tribe,* 164 F.3d 1102 (8th Cir.1999). The parties have returned to the Missouri state court, from which the case was originally removed.

selected numbers. A player may request written confirmation of the transaction, but the lottery ticket itself remains on the Reservation. Once a week, lottery officials draw a sequence of winning numbers and distribute the prize pool to players whose tickets contain them. An off-Reservation winner receives a credit to his or her account that is redeemable in person or through the mail.

The federally approved compact itself did not specify that off Reservation telephone purchases would be permitted.[2] However, a management contract between the Tribe and UNISTAR Entertainment, Inc. made clear that off-Reservation players could participate telephonically. As required by 25 U.S.C. § 2710(d)(9), the Tribe submitted the management contract to the Chairman of the National Indian Gaming Commission (NIGC) for approval. The Chairman approved the management contract, a decision that constitutes a final agency action. 25 U.S.C. § 2714. The Chairman subsequently clarified in a letter—in response to an inquiry about the Lottery's legality [3]—that:

> In the opinion of the NIGC, the Tribe's lottery proposal, which involves customers purchasing lottery tickets with a credit card both in person and by telephone from locations both inside and outside the state of Idaho, is not prohibited by the IGRA.

Following the NIGC's approval of the UNISTAR contract, the Tribe adopted a resolution and amended its Tribal Code to authorize the Lottery. Consistent with IGRA, the Tribe's resolution was deemed approved by the NIGC Chairman ninety days after its submission pursuant to 25 U.S.C. § 2710(e).[4]

In order to attract Lottery participants, the Tribe sought to establish toll-free telephone service to its on-Reservation offices from callers in states that operate their own state-run lotteries. AT & T was among the carriers with whom the Tribe negotiated to provide such service.

Upon learning that the Tribe intended to offer toll-free "Tele–Lottery" service, several state Attorneys General sent letters to AT & T allegedly pursuant to 18 U.S.C. § 1084(d), warning AT & T that furnishing interstate toll-free service for the Lottery would violate federal and state laws. Title 18 U.S.C. § 1084(d) provides that:

> When any common carrier, subject to the jurisdiction of the Federal Communications Commission, *is notified in writing by a Federal, State, or local law enforcement agency, acting within its jurisdiction,* that any facility furnished by it is being used or will be used for the purpose of transmitting or receiving gambling information in interstate or

2. The only relevant compact provision states: "Except as otherwise provided in this Compact, gaming authorized ... shall not be subject to any state restrictions, including the Tribe's advertising or promotion of the authorized games or any intrastate or interstate aspects of the permitted games. Provided, this section is not intended to permit gaming except on Indian lands as defined in Article 4.9."

3. MCI, another company from which the Tribe sought toll-free telephone service, made the inquiry.

4. 25 U.S.C. § 2710(e) states: "For the purposes of this section, by not later than the date that is 90 days after the date on which any tribal gaming ordinance or resolution is submitted to the Chairman, the Chairman shall approve such ordinance or resolution if it meets the requirements of this section. Any such ordinance or resolution not acted upon at the end of that 90–day period shall be considered to have been approved by the Chairman, but only to the extent such ordinance or resolution is consistent with the provisions of this chapter."

foreign commerce in violation of Federal, State or local law, it shall discontinue or refuse, the leasing, furnishing, or maintaining of such facility, after reasonable notice to the subscriber, but no damages, penalty or forfeiture, civil or criminal, shall be found against any common carrier for any act done in compliance with any notice received from a law enforcement agency. Nothing in this section shall be deemed to prejudice the right of any person affected thereby to secure an appropriate determination, as otherwise provided by law, in a Federal court or in a State or local tribunal or agency, that such facility should not be discontinued or removed, or should be restored.

(emphasis added). Upon receiving the § 1084(d) letters, AT & T informed the Tribe that it would not provide toll-free service until the Tribe resolved its legal differences with the States.

The Tribe filed an action in the Coeur d'Alene Tribal Court seeking to enjoin AT & T from denying toll free service based on the § 1084(d) letters. The Tribe argued that the Lottery is lawful under IGRA and that AT & T is therefore legally obligated to provide the requested service pursuant to the Federal Communications Act (FCA). *See* 47 U.S.C. § 201(a) (requiring common carriers engaged in interstate communication to furnish service upon reasonable request). AT & T challenged the personal and subject matter jurisdiction of the Tribal Court. The Tribal Court rejected AT & T's arguments, declared the Lottery lawful under IGRA, and enjoined AT & T from refusing to provide the requested service. The Tribal Court of Appeals affirmed.

AT & T then filed suit in federal district court seeking a declaration that the Tribal Court lacked jurisdiction and that the § 1084(d) letters relieved AT & T from any obligation to provide service. The district court determined that IGRA requires a participant in a lottery to be present on Indian lands when purchasing a ticket; therefore, the district court held that the lottery was operating outside IGRA, which would otherwise preempt state law. *AT & T Corp. v. Coeur D'Alene Tribe*, 45 F.Supp.2d 995, 1002–1003 (D.Idaho 1998). Finding that the Tribal Court's decision was erroneous as a matter of federal law, the district court denied as moot AT & T's motion for judgment that the Tribal Court lacked jurisdiction. *Id.* at 1005. The court also granted declaratory relief, stating that AT & T was not required to furnish toll-free service from any State that notified AT & T that the Tribe's Lottery would violate state law.[5] *Id.* at 1005–1006. The Tribe appeals.

## II. TRIBAL COURT JURISDICTION

As a general rule, federal courts must recognize and enforce tribal court judgments under principles of comity. *See Wilson v. Marchington*, 127 F.3d 805, 810 (9th Cir.1997). Two circumstances preclude recognition: when the tribal court either lacked jurisdiction or denied the losing party due process of law. *See Id.* Under limited circumstances, not present here, a federal court may refuse to recognize or enforce a tribal judgment on equitable grounds as an exercise of discretion. *See Id.*

Unless the district court finds the tribal court lacked jurisdiction or withholds comity for some other valid reason, it must

---

**5.** The district court concluded that the tribe's Lottery activity did not occur on Indian lands and therefore was not governed by IGRA. Because the § 1084(d) letters were sent by Attorneys General empowered only to enforce state law, the district court did not consider whether the Lottery violated federal law. *AT & T Corp.*, 45 F.Supp.2d. at 999.

enforce the tribal court judgment without reconsidering issues decided by the tribal court. *See Iowa Mutual Ins. Co. v. La-Plante,* 480 U.S. 9, 19, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987) ("Unless a federal court determines that the Tribal Court lacked jurisdiction ... proper deference to the tribal court system precludes relitigation of issues ... resolved in the Tribal Courts.").

■ The district court held the Coeur d'Alene Tribal Court's Order "erroneous as a matter of law," without deciding whether the Tribal Court had jurisdiction. *AT & T Corp.,* 45 F.Supp.2d. at 1005. The district court interpreted our decision in *FMC v. Shoshone–Bannock Tribes,* 905 F.2d 1311 (9th Cir.1990) as requiring federal courts to resolve *de novo* all issues of federal law decided in tribal court, regardless of whether the tribal court properly exercised jurisdiction over the dispute. *AT & T Corp.,* 45 F.Supp.2d at 1005. Our *FMC* holding was not so broad. *FMC* merely established a *de novo* standard of review for legal questions relevant to a tribal court's decision *regarding tribal jurisdiction. See FMC,* 905 F.2d at 1313–14. That holding does not affect the rule that federal courts may not readjudicate questions—whether of federal, state or tribal law—already resolved in tribal court absent a finding that the tribal court lacked jurisdiction or that its judgment be denied comity for some other valid reason. *Iowa Mutual,* 480 U.S. at 19, 107 S.Ct. 971.

■ Therefore, before addressing the merits of this case we must first determine whether the Tribal Court had jurisdiction. "[T]he existence of both personal and subject matter jurisdiction is a necessary predicate for federal court recognition and enforcement of a tribal judgment." *Wilson,* 127 F.3d at 811. Subject to a number

of exceptions, tribal courts ordinarily have the first opportunity to determine the extent of their own jurisdiction.[6] We need not decide whether exhaustion was required in this case or if any of the exceptions to exhaustion applied, because the tribal court did in fact have the first opportunity to determine the extent of its jurisdiction; thus, whether exhaustion was required or not, the issue of tribal jurisdiction is ripe for review.

■ The Coeur d'Alene Tribe sued AT & T pursuant to the Federal Communications Act (FCA), 47 U.S.C. §§ 151 *et seq.* Specifically, 47 U.S.C. § 201(a) mandates that:

It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor[.]

Section 202 of the FCA articulates the chapter's antidiscriminatory purpose, whereby it is:

unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service ... or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

47 U.S.C. § 202. In the event that a common carrier "shall omit to do any act, matter, or thing in this chapter required to be done," 47 U.S.C. § 206 dictates that:

such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation ... together with a reasonable counsel or attorney's fee[.]

---

6.   *See Nevada v. Hicks,* 533 U.S. 353, 369, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001).

Section 207 of the Act then sets forth how a party may pursue remedies for claimed injuries sustained under the preceding sections. Specifically, 47 U.S.C. § 207 provides that:

> [a]ny person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to [the FCC] ... or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.

While plaintiffs typically invoke § 207 in damages actions alleging deviation from common carriers' filed rates, the provision is equally applicable where a plaintiff claims a complete denial of service in violation of § 201. The Supreme Court recently stressed that the antidiscriminatory provisions of the FCA applied equally to *services* and rates. *See American Tel. and Tel. Co. v. Central Office Tel., Inc.,* 524 U.S. 214, 223–225, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998).

By its express language, § 207 establishes concurrent jurisdiction in the FCC and federal district courts only, leaving no room for adjudication in any other forum—be it state, tribal, or otherwise. The Tribe had no recourse to its own courts for vindication of its FCA-based claim and—like any other plaintiff—could choose only between filing a complaint with the FCC or suing AT & T in federal district court.

Because exclusive jurisdiction rested in either of the two statutorily-provided fed-

eral fora, the Tribal Court lacked jurisdiction to entertain the Tribe's claim.

## III.   LEGALITY OF THE LOTTERY

Because it found the Tribal Court decision erroneous, the district court considered the merits of AT & T's claims. After engaging in lengthy statutory interpretation, the district court concluded that the IGRA unambiguously requires that a purchaser of a chance in the Lottery be physically present on the Reservation in order for the gaming activity to fall within IGRA's preemptive reach. Based on its conclusions that lottery purchases initiated off-Reservation would thus be subject to state gambling laws, the district court granted summary judgment in favor of AT & T, holding that the § 1084(d) letters required AT & T to refrain from providing toll free service for off-Reservation, out-of-state would-be Lottery participants where such service would violate state law. *AT & T Corp.,* 45 F.Supp.2d at 1005–1006.

We review the district court's grant of summary judgment *de novo. Delta Savings Bank v. United States,* 265 F.3d 1017, 1021 (9th Cir.2001).

In ruling as it did, the district court discounted the NIGC's approval of the Tribe's management contract with UNISTAR—a contract that made clear the Tribe's plans with respect to telephonic sales. The NIGC approval of both the management contract and the tribal resolution authorizing the Lottery were final agency decisions subject to review under the Administrative Procedures Act. 25 U.S.C. § 2714.[7]   Moreover, the district court—apparently eager to provide AT &

---

7. The dissent devotes considerable space to explaining why the Chairman's letter to MCI explaining that the IGRA does not prohibit the lottery was a final agency action. Our opinion in no way relies on the letter as a final agency action—something it clearly is

not. Both the approval of the management contract and the approval of the ordinance are final agency actions, while the Chairman's subsequent statement in his letter to MCI is simply clarification and evidence that the NIGC was aware of the relevant issues.

T and the various states breathing down the corporation's neck with a definitive answer regarding the Lottery's legality—completely sidestepped two crucial considerations: (1) the effect it should accord the NIGC approval made consistent with the requirements of the detailed regulatory scheme Congress provided when it enacted the IGRA; and (2) whether AT & T, a provider of telephonic services, is an appropriate challenger.

Although AT & T has taken the lead in the instant litigation, the thirty-plus states that have briefed this court as *amici*—most of which operate their own lotteries—have the biggest stake in challenging the validity of the Tribe's Lottery. Since providing toll-free service for the Lottery would hand AT & T a new revenue source, the company would likely provide service to the tribe for the Lottery in the absence of § 1084(d) pressure. But faced with a stack of letters warning the carrier that it might be liable for supporting gambling in violation of many states' laws, AT & T sought some sort of definitive declaration of its responsibilities under both the FCA and § 1084(d).

In fact, AT & T's responsibilities were decided long before the parties set foot in any of the various courts that have entertained this case. The NIGC's final agency actions approving both the management contract and the Tribe's resolution indicated that the Lottery is legal until and unless the NIGC's decision is overturned.

When it enacted the IGRA, Congress created a detailed regulatory structure for the approval of Class III gaming. The Tribe was successful in its effort to obtain approval for the lottery, doing so pursuant to the IGRA's regulatory scheme. First, the Tribe and the State of Idaho entered into a compact that provides, in relevant part, that gaming will occur only on Indian lands.[8] The compact specifies that Class III gaming must abide by the IGRA: "The Tribe may enter into management contracts for the development and management of gaming authorized by and consistent with this Compact and in accord with regulations, [IGRA], and the Gaming Code." The NIGC and the Secretary of the Interior approved the compact in 1993. *See* 58 Fed.Reg. 8478 (Feb. 12, 1993).

In 1995, the Tribe adopted a resolution stating:

[R]esolved, "that all Class III gaming authorized by the Compact by and between the Coeur d'Alene Tribe and the State of Idaho be conducted pursuant to tribal law. This specifically authorizes the conduct of the National Indian Lottery under the Management Agreement with Unistar Entertainment, Inc. which has been previously approved by the Chairman of the National Gaming Commission."

[F]urther resolved, "that all Class III gaming herein authorized be conducted in accordance with all provisions of 25 U.S.C. § 2710(d) and 2710(b) made applicable to Class III gaming by 2710(d)(1)(A)(ii) all of which are incorporated herein by reference."

The NIGC approved the resolution under the IGRA.[9] Before doing so, the Commis-

---

8. The compact defines Indian lands "as defined in the [IGRA], as well as lands within the state which meet the requirements of 25 U.S.C. § 2719."

9. The dissent makes much of the fact that the Chairman did not issue an affirmative approval of the resolution. Instead, consistent with 25 U.S.C. § 2710(e), the resolution was considered approved ninety days after submission "to the extent such ordinance or resolution is consistent with the provisions of this chapter." The dissent argues that the lack of an affirmative statement that the resolution complied with IGRA means, in fact, that the NIGC Chairman did not approve the resolu-

sion had to determine that the resolution would comply with the Tribal–State compact, including the language requiring IGRA compliance.[10]

Like resolutions, management contracts must meet IGRA requirements before they can win NIGC approval.[11] The Tribe's management agreement with UNISTAR—including the "Tele–Lottery" service—won the NIGC Chairman's approval in the summer of 1996 after a review process that lasted over one year. That approval constituted a final agency action subject to review pursuant to the Administrative Procedures Act. 25 U.S.C. § 2714.

Though the statutory framework suffices to demonstrate that the NIGC must consider the legality of Class III gaming

---

tion at all. The law, however, tells us otherwise. Pursuant to 25 U.S.C. § 2710(e), the resolution was approved for IGRA purposes ninety days after submission. Title 25 U.S.C. § 2714, in turn, tells us that decisions made pursuant to § 2710—whether made tacitly or otherwise—are final agency decisions for purposes of appeal. Section 2714 in no way differentiates between decisions made through a formal approval and those tacitly approved.

10. The relevant IGRA statutes and implementing regulations requiring compliance before resolutions may be approved include the following:

**25  U.S.C. § 2710(d)**
(1) Class III gaming activities shall be lawful on Indian lands only if such activities are—
(C) *conducted in conformance with a Tribal State compact* entered into by the Indian tribe and the State under paragraph (3) that is in effect.

**25  U.S.C. § 2710(d)(2)**
(A) If any Indian tribe proposes to engage in, or to authorize any person or entity to engage in, a class III gaming activity *on Indian lands of the Indian tribe, the governing body of the Indian tribe shall adopt and submit to the Chairman an ordinance or resolution* that meets the requirements of subsection (b) of this section.
(B) The Chairman shall approve any ordinance or resolution described in subparagraph (A), unless the Chairman specifically determines that—
(i) *the ordinance or resolution was not adopted in compliance with the governing documents of the Indian tribe,* or . . .
(C) Effective with the publication under subparagraph (B) of an ordinance or resolution adopted by the governing body of an Indian tribe that has been approved by the Chairman under sub-paragraph (B), class III gaming activity on the Indian lands of the Indian tribe shall be fully subject to the terms and conditions of the Tribal State compact entered into under paragraph (3) by the Indian tribe that is in effect.

**25  C.F.R. § 522.7:**
(a) Notwithstanding compliance with the requirements of § 522.6 of this part and no later than 90 days after a submission under § 522.2 of this part, the Chairman shall disapprove an ordinance or resolution and notify a tribe of its right of appeal under part 524 of this chapter if the Chairman determines that—
(1) *A tribal governing body did not adopt the ordinance or resolution in compliance with the governing documents of a tribe* [e.g. the Tribal State compact].

11. Management contracts are reviewed according to a statutory and regulatory scheme including the following:

**25  U.S.C. § 2710(b)**
(1) An Indian tribe may engage in, or license and regulate, [class III] gaming on Indian lands within such tribe's jurisdiction if—
(A) such Indian gaming is located within a State that permits such gaming for any purpose . . .

**25  C.F.R. § 533.6**
(a) The Chairman may approve a management contract if it meets the standards of part 531 of this chapter and § 533.3 of this part.

**25  C.F.R. § 531.1**
[A] management contract not previously approved by the Secretary shall conform to all of the requirements contained in this section in the manner indicated.
(a) *Governmental authority.* Provide that all gaming covered by the contract *will be conducted in accordance with the Indian Gaming Regulatory Act* (IGRA, or the Act) and governing tribal ordinance(s).

before approving compacts, resolutions, ordinances, and management contracts, in this case documentary evidence also shows close NIGC consideration. As the district court noted, the NIGC approved the Tribe's management agreement and Lottery plan knowing that calls would be placed from other states. Although the dissent seems to entertain the view that the NIGC does not consider whether or not a particular gaming operation will comply with the IGRA, an affidavit submitted on the Tribe's behalf—and not contradicted by AT & T or the *amici*—tells us:

> [t]he NIGC repeatedly informed the Tribe throughout the review process for the management agreement that it would not approve the agreement unless the NIGC were satisfied about the legality of the National Indian Lottery. After an exhaustive review that took more than one year, the NIGC approved the management agreement.

The district court also quoted the letter from then-NIGC Chairman Monteau to MCI clarifying that the IGRA did not prohibit the lottery—further evidence that the Commission did, in fact, consider the Lottery's legality as IGRA requires.

Furthermore, the NIGC Chairman had an opportunity to revisit the Lottery's legality. An amendment to the Unistar Management Agreement won approval (another final agency action) from the NIGC Chairman. The amendment included notice of the use of telephone and other off-reservation means of access: " 'Tele–Lottery' means Lottery Games or other Games authorized by the Compact and conducted using any voice, data or video networks." The NIGC Chairman's approval of the amendment reads, in relevant part:

> The Indian Gaming Regulatory Act (IGRA) and the regulations of the National Indian Gaming Commission

(NIGC) require that management contracts for class II and class III gaming operations be approved by the Chairman of the NIGC. Accordingly, you submitted the Amendment as required by 25 CFR Part 535 of the NIGC's regulations.

> We have reviewed the Amendment and other information submitted and have determined that the standards of 25 CFR Parts 531 and 535 have been met. This letter, and my signature on the Amendment, constitute such approval. If the Chairman learns of any actions or conditions that violate the standards contained in 25 CFR Parts 531, 533, 535, or 537, the Chairman may require modifications of, or may void, the approved contract, after providing the parties with an opportunity for a hearing before the Chairman and a subsequent appeal to the NIGC as set forth in 25 CFR Part 577.

Title 25 CFR § 531—cited by the NIGC Chairman as a regulation whose provisions must be met—requires provision that gaming will comply with IGRA.

What the district court failed to grasp was that the IGRA lays out a specific regulatory scheme whereby the NIGC's approval of a management contract is a final agency decision that may be appealed only directly and in an action initiated by a proper party in federal district court. Specifically, 25 U.S.C. § 2714 provides that NIGC approvals of management contracts and tribal ordinances are "final agency decisions for purposes of appeal to the appropriate Federal district court pursuant to [the Administrative Procedures Act]."

The amicus brief of the United States, to which the current NIGC Chairman is a signatory, denies that the NIGC interpreted the IGRA to allow the Lottery's off-reservation features. The United States

argues—and the dissent agrees—that Chairman Monteau's letter did not say the IGRA *permits* the Lottery's telephonic aspects, but rather that it does not *prohibit* the Lottery.

Such a reading of Chairman Monteau's letter is a stretch. The NIGC is statutorily obliged to reject any lottery proposal that does not conform to IGRA. *See* 25 U.S.C. § 2706(b)(10) (requiring the NIGC to promulgate regulations and guidelines to implement IGRA); and 25 C.F.R. § 531.1(a) ("[A]ll gaming covered by the contract will be conducted in accordance with the Indian Gaming Regulatory Act."). In fact, the NIGC has previously refused to approve management agreements when it believed the proposed gaming activity will not be conducted "on Indian lands" for IGRA purposes. *See, e.g., Miami Tribe of Oklahoma v. United States,* 5 F.Supp.2d 1213, 1218 (D.Kansas, 1998). The record contains ample and undisputed evidence that the Commission was aware that the Tribe planned to accept telephone orders from individuals outside the Reservation. Read in the context of a detailed regulatory scheme and multiple final agency actions by the NIGC, the NIGC's approval of the Tribe's management contract evidences the NIGC's determination that IGRA permits operation of the Lottery even though it allows ticket sales via off-Reservation phone calls.

For their part, the *amici* states and the United States point to the opinion of a new NIGC Chairman, who believes that the Lottery is not protected by the IGRA insofar as it involves off Reservation ticket purchases. But even if the Chairman may undo the work of a predecessor under some circumstance, he may not do so here.

The United States and any of the *amici* states were free to challenge the NIGC's final agency decision directly in federal court under 25 U.S.C. § 2714. None did

so. Unless and until the NIGC's decision is overturned by means of a proper challenge and appeal, the IGRA governs the Lottery.

■ Since IGRA applies, so too does 18 U.S.C. § 1166(d), which mandates that "[t]he United States shall have exclusive jurisdiction over criminal prosecutions of violations of State gambling laws" unless the tribe in question has consented to State criminal jurisdiction, which the Coeur d'Alene Tribe has not. Thus, where IGRA-governed Class III gaming is concerned, the federal government has the exclusive authority to prosecute any state gambling law violations applicable in Indian country. States, on the other hand, are without jurisdiction. *See e.g., United States v. E.C. Investments, Inc.,* 77 F.3d 327, 330–331 (9th Cir.1996) (holding that California lacked jurisdiction to prosecute alleged violations of state gambling laws by means of Class III gaming conduct).

■ This brings us to the 18 U.S.C. § 1084(d) letters that ostensibly underlie the instant action. As explained, § 1084(d) permits a federal, state, or local law enforcement agency "*acting within its jurisdiction* " to demand that a common carrier refuse service where state gambling laws may be violated. If IGRA governs the Lottery—as it does until a proper plaintiff challenges the NIGC's approval of the management contract—then under 18 U.S.C. § 1166 the states and their various Attorneys General were not acting within their jurisdiction when they posted their § 1084(d) letters to AT & T.

For their part, the *amici* states are not without recourse to challenge the Lottery and to seek a determination as to what constitutes gaming activities "on Indian land" within the meaning of the IGRA. They must, however, rely on their own resources—and not AT & T's—to make

their case. The states might have joined this litigation at its beginning in the district court to attack the NIGC's decision directly under 25 U.S.C. § 2714. They did not. Should they succeed at some future time in stripping the Lottery of its legitimacy under IGRA, they then will have the authority to issue § 1084(d) letters.[12] Until such time, both the Tribe and AT & T may continue their activities—and in AT & T's case meet its legal obligations—without fear of prosecution.

REVERSED AND REMANDED.

GOULD, Circuit Judge, concurring in part and dissenting in part:

Although I concur in Part II of the majority opinion holding that the tribal court did not have subject matter jurisdiction over AT & T, I must respectfully dissent from Part III and the judgment. I would hold that the National Indian Gaming Commission ("NIGC") did not issue a final decision that the National Indian Lottery ("NIL") complies with the Indian Gaming Regulatory Act ("IGRA") and, therefore, that the district court could examine that issue in the first instance. Accordingly, I would reach the merits of the legality of the NIL and would conclude, as did the district court, that the NIL is clearly illegal under the IGRA because it involves tribe-sponsored gambling that does not occur on Indian lands. AT & T did not act improperly in refusing to provide toll-free service to the Coeur d'Alene Tribe of Idaho ("Tribe").

I see no principled basis for the majority to reverse the district court's well-reasoned decision. The majority's inexplicable decision to resolve this case solely on incorrect procedural grounds has the effect, if not the purpose, of avoiding the obvious conclusion that the NIL is illegal under the IGRA. The majority purports to exercise judicial restraint by putting off the resolution of this issue for another day. Avoiding the merits, the majority rests its decision on an incorrect procedural ground. It thereby does a disservice to AT & T, the thirty-seven states that have appeared as amici curiae,[1] the federal government, also amicus curiae, and even to the Tribe advancing the NIL and possibly other tribes that may be contemplating similar national gambling operations. All of the governments and other entities who will be affected by this case would benefit from an efficient and correct resolution of the important issue whether an Indian nation may run a national lottery that depends on off-reservation ticket purchases.[2]

---

12. This Court draws no conclusions as to how the Lottery might fare when properly challenged in federal court and balanced against state laws and interests. The dissent's desire to reach what it contends is an "obvious conclusion" does not relieve us of our obligation to address only those issues that are properly before us, and does not eliminate the deference due to final agency actions.

1. The states which have appeared as amici curiae are: Minnesota, Florida, Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, Georgia, Hawaii, Illinois, Indiana, Iowa, Kansas, Louisiana, Massachusetts, Michigan, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New York, New Mexico, North Dakota, Ohio, Okla-

homa, Oregon, Pennsylvania, South Dakota, Utah, Vermont, Virginia, Washington, West Virginia, and Wyoming. The federal government also has appeared as amicus curiae, supporting AT & T's position along with the several states listed. The federal government has also advised of the position of the NIGC that the NIL is illegal under the IGRA because the gaming—when citizens not on Indian lands buy lottery tickets—does not occur on Indian lands.

2. By analogy, resolution of this important issue may have implications for whether tribes under the IGRA may run Internet gambling operations that effectively know no geographic bounds.

If the merits were reached and resolved against the Tribe, as I believe they must be under applicable law and consistent with Congress' intent, the Tribe could turn its attention to a proper development of its legally viable gaming options, rather than proceeding on the false hope that it will be permitted to implement the NIL.[3]

## I. The NIGC Did Not Render a Final Decision on the Legality of the NIL.

The majority is correct that final NIGC decisions are reviewable under the judicial review provisions of the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.*, and that, under the APA, such decisions must be challenged directly within a specified time frame. *See* 25 U.S.C. § 2714 (stating that NIGC decisions are subject to review under the APA); *see also Nagahi v. INS*, 219 F.3d 1166, 1170–71 (10th Cir.2000) (discussing statutes of limitations for actions under the APA). The majority errs, however, in concluding that the NIGC issued a final decision holding that the NIL complies with the IGRA. Absent such a decision, the district court was correct in proceeding to the merits of that question.

### A. The Letter from the NIGC to MCI Was Not A Final Agency Decision.

To support its view that the NIGC decided that the NIL was authorized by the IGRA, the majority relies on an informal letter from the NIGC to MCI, which is not a party to this litigation. However, the majority's reliance on the letter is not warranted because the letter is not a final agency decision. While it is true that the letter concludes that the NIL, "[i]n the opinion of the NIGC, ... is not prohibited by the IGRA," that guarded statement does not necessarily mean that the NIL complies with and is authorized under the IGRA's requirement that gaming be conducted on Indian lands.[4] More importantly, the majority cannot rely on the letter to support its view that the NIGC issued a final agency decision as to the NIL's compliance with the IGRA because the letter is by no means a final agency decision.

First of all, the letter is not among the types of NIGC actions that the IGRA explicitly identifies as final agency actions subject to direct judicial review under the APA and that accordingly would be granted preclusive effect absent a proper direct appeal. 25 U.S.C. § 2714 (providing that decisions as to management contracts, ordinances and resolutions, and civil penalties are final, reviewable decisions). Also, the letter bears none of the indicia of final agency action to which we are required to give preclusive effect absent a timely direct appeal.

The Supreme Court has set two requirements for final agency action:

First, the action must mark the "consummation" of the agency's decision-making process, *Chicago & Southern Air Lines v. Waterman S.S. Corp.*, 333

---

3. The Tribe's attempt to pursue the NIL, if not corrected by this court en banc or by the Supreme Court, presages a disastrous marriage of tribal interests with off-reservation gambling that can be avoided in the near future only by an action of Congress to clarify the IGRA. After the experience in this case, where the appeal was filed in January 1999 over a controversy started years before, one wonders if any sensible person would seek a judicial resolution.

4. Because the IGRA governs only gambling on Indian lands, it neither permits nor prohibits tribe-sponsored gambling *off* Indian lands. *See, e.g.,* 25 U.S.C. § 2710(d) (stating that "[c]lass III gaming activities shall be lawful *on Indian lands* " only if certain conditions are complied with) (emphasis added). Thus, a statement that the IGRA does not prohibit a national lottery does not mean that the IGRA authorizes such a lottery.

U.S. 103, 113, 68 S.Ct. 431, 92 L.Ed. 568 (1948)—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow," *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970). *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997);[5] *see also Fogel v. Dep't of Def.*, 169 F.Supp.2d 140, 148–49 (E.D.N.Y.2001); *Cmtys. for a Great Northwest v. Clinton*, 112 F.Supp.2d 29, 37–38 (D.D.C.2000). Neither of those two requirements has been met here.

As to the first requirement, the letter to MCI did not mark the consummation of any decisionmaking process. Instead, the phrasing of the letter suggests that it is an advisory letter most likely drafted as a courtesy in response to an inquiry by MCI.[6] As a response to an informal inquiry, the letter is, by definition, "interlocutory [in] nature" and, therefore, not final under *Bennett*.[7] 520 U.S. at 178, 117 S.Ct. 1154. Moreover, although the letter purports to describe "the view of the NIGC" as to the legality of the NIL under the IGRA, it does not directly refer to, or even implicitly suggest, any prior decisionmaking process that culminated in the NIGC's espousal of its stated view. And it certainly shows no analysis whatsoever of whether the gaming contemplated by the NIL would occur on Indian lands. The letter does not meet *Bennett's* first requirement for final agency action because it does not mark the consummation of any decisionmaking process and because it is tentative and interlocutory in nature; in its most important feature for us, it makes no explicit determination whether lottery gaming occurs on Indian lands.

As to the second requirement, it is even more clear that the letter was not an action "by which rights or obligations [were] determined, or from which legal consequences ... flow[ed]." *Id.* (citations and internal quotation marks omitted). The letter was addressed to, and was in response to the inquiry of MCI, an entity that is not a party to this litigation. Thus the letter could not have established any rights or obligations between the Tribe and AT & T, the plaintiff in this action. Moreover, although the letter purported to state "the view of the NIGC," it did not suggest that any rights or obligations on the part of MCI (or even the Tribe) would stem from the NIGC's view as to the NIL's legality. The letter carried no "direct and appreciable legal consequences"

---

5. The Court in *Bennett* elaborated that an agency action is not final if it carries no "direct and appreciable legal consequences" and functions more "like a tentative recommendation than a final and binding determination." 520 U.S. at 178, 117 S.Ct. 1154 (citations and internal quotation marks omitted).

6. The letter, which is dated September 21, 1995, begins "Thank you for your letter of July 27, 1995, concerning the ... proposed national lottery." It then sets out the degree to which the Tribe's actions comply with the technical and procedural requirements of the IGRA, such as the Tribe's procurement of the Secretary of Interior's approval for its compact with the State of Idaho as well as the approval of the Chairman of the NIGC for its gaming ordinance.

7. The legal meaning of "interlocutory" is "preliminary, provisional, [or] interim," 1 *The New Shorter Oxford English Dictionary* 1396 (1993), in other words, "not final." However, further clarity can be gained by looking at the ordinary meaning of the term, which is "[o]f, pertaining to, or occurring in dialogue or conversation." *Id.* As the latter definition makes abundantly clear, a letter responding to an informal inquiry is inherently interlocutory and therefore not final.

and functioned more "like a tentative recommendation than a final and binding determination." *Bennett,* 520 U.S. at 178, 117 S.Ct. 1154 (citations and internal quotation marks omitted). In short, it did not meet *Bennett's* second requirement for finality.[8]

The letter from the NIGC does not meet either of the Supreme Court's two requirements for final agency action. Thus, the letter lends no support to the majority's view that the NIGC issued a final decision approving the NIL and, therefore, that we cannot reach the merits of that question here. On the contrary, we have a duty to reach the merits of the legality of the NIL under the IGRA.

B.  The Chairman's Approval of the Management Contract Does Not Indicate that He Concluded that the NIL Was Authorized by the IGRA.

Not only does the majority err in relying on the NIGC letter, but it also errs in suggesting that, in approving the Tribe's management contract, the NIGC Chairman necessarily concluded that the NIL is legal under the IGRA. Thus, although 25 U.S.C. § 2714 provides that approval of a tribe's management contract is a final agency decision, the fact that the Tribe's management contract received the necessary approval does nothing to help the majority's incorrect position that the NIGC decided that the NIL complies with the IGRA. The same is true of the NIGC's approval of the amendment to the management contract.

The majority relies on the NIGC Chairman's August 15, 1996 letter approving the Tribe's gaming management contract as evidence that the NIGC reached a final decision that the NIL was legal under the IGRA. The problem with this argument is that the Chairman's letter does not at all indicate that he evaluated the NIL's compliance with the substantive provisions of the IGRA as part of the approval process. Moreover, nothing in the statutory and regulatory frameworks that govern the approval process indicates that the Chairman is even authorized to evaluate the legality of the proposed gaming operations under the IGRA in deciding whether to approve the management contract. *See* 25 U.S.C. §§ 2711,[9] 2712(c); 25 C.F.R. §§ 531.1,[10]

8.  Reinforcing the conclusion that the letter was tentative is the current NIGC position, as represented by the federal government, that NIL gaming off Indian lands is illegal.

9.  The Tribe relies on 25 U.S.C. § 2711(e)(4), which provides that the Chairman may disapprove a contract on the grounds that a trustee, exercising appropriate skill and diligence, would disapprove it, for the proposition that the Chairman must have decided that the NIL was legal before he approved the contract. However, the other subsections of § 2711(e) all relate to corruption or conflicts of interest on the part of the management contractor. Given that context, it is reasonable to conclude that (e)(4) simply refers to other, unspecified types of corruption or conflicts of interest which would preclude a trustee from approving a contract, rather than to any conceivable reason that a trustee might disapprove a contract. *See Sutton v. Providence St.*

*Joseph Med. Ctr.,* 192 F.3d 826, 834 (9th Cir. 1999) (stating that, under the doctrine of *ejusdem generis,* "[w]hen a statute contains a list of specific items and a general item, we usually deem the general item to be of the same category or class as the more specifically enumerated items").

10.  The majority mistakenly relies on 25 C.F.R. section 531.1(a) to reach a contrary conclusion. Section 531.1 governs the "[r]equired [p]rovisions" of a management contract. Subsection (a) requires the contract literally to *provide* that all gaming covered by the contract will be conducted in accordance with the IGRA. As the district court correctly recognized, under section 531.1(a) and related provisions of the Code of Federal Regulations, the Chairman, in deciding whether to approve a tribe's management contract, actually reads the contract to determine whether the contract literally states that gambling ac-

533.4, 533.6. Given, first, that the Chairman did not indicate that his decision to approve the contract was based, in part, on a conclusion that the NIL was legal under the IGRA [11] and, second, that the Chairman had no statutory or regulatory duty to consider that issue, there is no reasoned basis for the majority to infer that the legality of the NIL was decided in favor of the Tribe as part of the Chairman's decision to approve the management contract.[12]

### C. The Majority Also Errs in Relying on the Chairman's Alleged De Facto Approval of the Tribe's Resolution.

As the majority indicates, the Chairman did not actively approve the Tribe's gaming resolution; rather he simply did not respond to it within the 90 day period after the Tribe submitted the resolution to him.

*See* 295 F.3d at 902. The majority is correct that, in some circumstances, *i.e.*, when the resolution complies with the IGRA, such inaction is tantamount to approval. However, 25 U.S.C. § 2710(e) provides that a resolution on which the Chairman failed to act within the 90 day period "shall be considered to have been approved by the Chairman, *but only to the extent such ordinance or resolution is consistent with the provisions of this chapter.*" [13] (Emphasis added.) Thus, § 2710(e) stands for the opposite proposition to the one for which the majority cites it. It means that the Chairman *did not* approve the resolution by failing to act upon it: because the resolution was not consistent with the IGRA, it legally could not be approved by inaction. Irrespective of whether the Chairman's active approval

tivities will be conducted in accordance with the IGRA. Such a "'paper review'" in no way qualifies as a substantive analysis as to compliance with the IGRA. *AT & T Corp. v. Coeur D'Alene Tribe*, 45 F.Supp.2d 995, 1003 (D.Idaho 1998) (quoting *Bruce H. Lien Co. v. Three Affiliated Tribes*, 93 F.3d 1412, 1418 (8th Cir.1996)).

11. The majority cites the affidavit of a tribal gaming official as evidence that the NIGC necessarily determined that the management contract complied with the IGRA prior to approving it. 295 F.3d at 907. The proper place to look for evidence of the NIGC's alleged legal conclusions is, however, not a third party's summary of informal discussions with the agency, but the actual agency decision itself. *See, e.g., Bennett*, 520 U.S. at 177–78, 117 S.Ct. 1154.

12. The majority relies on *Miami Tribe of Okla. v. United States*, 5 F.Supp.2d 1213, 1218 (D.Kan.1998), for the proposition that the NIGC generally considers the legality of the proposed gambling operations under the IGRA in deciding whether to approve a management contract. *See also Kansas v. United States*, 249 F.3d 1213 (10th Cir.2001) (a subsequent appeal addressing a later decision of the NIGC with respect to the same parties

and the same issue). The majority misses the point. *Miami Tribe* and *Kansas* differ from this case because in those cases, the NIGC had explicitly indicated, *in its decision*, that it was deciding whether to approve the contract based on the perceived legality of the proposed gaming operations under the IGRA.

It makes no sense to defer to the practices of an administrative body *in other cases* when there is no indication that the administrative body followed those practices in this case. It is particularly improper to do so when the relevant statutory and regulatory schemes do not give the administrative body authority to engage in those practices. The majority's reliance on *Miami Tribe* is in error.

Moreover, although it appears to be undisputed that the NIGC knew that the NIL involved off-reservation telephone purchases prior to the Commission's approval of the management contract, as evidenced by the affidavit from David Matheson, a tribal gaming official, both the majority and the Tribe attribute undue significance to the NIGC's awareness of the NIL's off-reservation character during the period before its approval of the Tribe's management contract.

13. As explained in Part II, *infra*, I consider the conclusion that the NIL does not comply with the IGRA to be inescapable.

of a resolution means that he has determined that it complies with the IGRA, no such approval occurred here.

In sum, the letter from NIGC to MCI was not a final agency decision. The Chairman's approval of the management contract is not conditioned on a determination that the proposed gaming complies with the IGRA. The Chairman's inaction as to the Tribe's gaming resolution is not legally tantamount to approval, where, as here, the resolution does not comply with the IGRA. Accordingly, there is no final agency decision as to the NIL's compliance with the IGRA that requires our deference.[14] The majority errs in concluding otherwise.

II. *The IGRA Does Not Authorize the NIL.*

Because there has been no prior, final agency determination on the legality of the NIL under the IGRA, we must address that issue to resolve AT & T's declaratory judgment action. I would reach the merits and conclude that the IGRA is unambiguous in its failure to authorize the NIL.

A. The IGRA Unambiguously Requires the Tribe's Gaming Operations to be Conducted on Indian Lands.

Lotteries are included under the definition of class III gaming in the regulations implementing the IGRA. 25 C.F.R. § 502.4. Class III gaming is the most stringently regulated of the three classes. *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 48, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Class III gaming on Indian lands is permitted only if (1) "such gaming is not otherwise specifically prohibited on Indian lands by federal law," (2) the Tribe enters into a compact governing gaming with the State in which the Indian lands are located, and (3) the Secretary of the Interior approves of the Tribal State compact. 25 U.S.C. § 2710(b)(1)(A), (d)(1) and (d)(8).

The district court correctly concluded that the term "gaming activities" plainly includes a player's ordering a ticket because, without that activity, the lottery could not operate. The NIL included gaming activities off Indian lands because of the telephonic participation of its players. A NIL participant does not need to enter the Tribe's reservation, but can bet by telephone. For example, a participant: (1) registers to play the lottery; (2) establishes and deposits funds into a gaming account; (3) plays the lottery by calling from off the reservation and authorizing a debit to his or her account and selecting the numbers; (4) receives written confirmation of the transaction upon request; and (5) can have lottery winnings mailed, off the reservation, directly to him or her. The NIL beyond doubt, and with any common sense assessment, involves gaming activity off Indian lands because players (1) place their bets while outside the Indian reservation, and (2) can receive the winnings off the reservation. The IGRA protects and advances on-reservation gaming; the proposed national lottery involves and encourages illegal gaming nationwide off the reservation and is not within the purview of the IGRA.

The Tribe argues that the term "gaming activities" is ambiguous, but grasps to find ambiguity where there is none in an attempt to save its lottery from being foreclosed by federal law and from running afoul of state laws prohibiting such gambling in their jurisdictions. When words are not defined in a statute, they must be

---

**14.** The fact that the NIGC has signed on to the United States' amicus brief in support of AT & T reinforces my conclusion that the NIGC did not previously render a final decision to the contrary.

"interpreted as taking their ordinary, contemporary, common meaning." *United States v. Akintobi,* 159 F.3d 401, 403 (9th Cir.1998) (citations and internal quotation marks omitted). "Gambling"[15] is "[t]he act of risking something of value ... for a chance to win a prize." *Black's Law Dictionary* 687 (7th ed.1999). The Oxford English Dictionary defines "activity" as "the state of being active," and defines "active" as "1 [g]iven to action rather than contemplation or speculation; practical[;] 2[o]riginating or communicating action." 1 *The New Shorter Oxford English Dictionary* 22 (1993). Here, the issue is whether the active aspects of gaming occurred on Indian lands.

In my view, no reasonable person could interpret the facts to conclude that gaming activities under the NIL do not occur off Indian lands. Placing the calls, selecting the numbers and receiving the winnings are indispensable elements of the operation of the NIL and all these activities occur off Indian lands. Gaming would occur off Indian lands each time and in each location a player participated in the NIL, if that person was not physically on Indian lands. *See, e.g., Martin v. United States,* 389 F.2d 895, 897–98 (5th Cir.1968) (stating that telephonic transmission of wager implicates the public policies of the state from which the wager is placed), *cert. denied,* 391 U.S. 919, 88 S.Ct. 1808, 20 L.Ed.2d 656 (1968).

Federal law might well protect a lottery where all betting occurred by persons purchasing lottery tickets on Indian lands. That at least would serve a benign purpose to bring lottery players on to Indian lands and perhaps increase cross-cultural understanding. But nothing like that is contemplated by the NIL. It would serve as a national gambling operation for off-reservation persons wherever situated without respect to Indian lands.

In short, the essence of gaming is the placing of a bet and the collection of the winnings. Those essential activities occur off the reservation and not on Indian lands. Only a subterfuge and strained argument that an account is established at the reservation is offered as a justification. This is too preposterous a position and too slim a reed to support the planned national lottery to be run by the Tribe.

Equally important, the compact requirement of the IGRA balances the respective interests of tribes and states regarding class III gaming and mandates a negotiation between sovereigns to address these interests. S.Rep. No. 446, at 5–6, *reprinted in* 1988 U.S.C.C.A.N. 3071, 3075–76. The IGRA clearly contemplated that each state be given the opportunity to negotiate with and reach agreement with tribes in that state for the offering of class III gaming. However, telephonic participation would undoubtedly include persons in states that have not entered into a compact, thereby circumventing the guidelines delineated in 25 U.S.C. § 2710. Here, the only state that entered into a compact with the tribe was Idaho. For these reasons, participation in the NIL occurs off Indian lands, and, with the exception of gambling activity within the State of Idaho, the NIL lacked the required predicate for class III gaming of successful negotiations between sovereigns.

The legislative history of the IGRA supports the reading that the NIL occurs off Indian lands. The IGRA's legislative history and attendant policy objectives make it clear that the IGRA authorizes tribal gaming activities exclusively on Indian lands, whereas the NIL would include ac-

---

**15.** In *Black's Law Dictionary* 687 (7th ed.1999), "gaming" is defined as "gambling."

tivities off Indian lands. *See Cabazon Band of Mission Indians v. Wilson*, 37 F.3d 430, 433–35 (9th Cir.1994) (implying that the tribe's interest in gaming activity under the IGRA derives from the fact that the activity occurs on the reservation), *cert. denied*, 524 U.S. 926, 118 S.Ct. 2319, 141 L.Ed.2d 694 (1998). Congress enacted the IGRA expressly to preserve and balance mutual and competing federal, state, and tribal interests in Indian gaming on Indian lands. *See Confederated Tribes of Siletz Indians of Or. v. United States*, 110 F.3d 688, 693 (9th Cir.1997). The Senate Report by the Indian Affairs Committee reveals that the IGRA was the product of years of "negotiations between gaming tribes, States, the gaming industry, the administration, and the Congress, in an attempt to formulate a system for regulating gaming on Indian lands" which simultaneously "preserve[s] the right of tribes to self-government," "protect[s] both the tribes and the gaming public from unscrupulous persons," "achieves a fair balancing of competitive economic interests," S.Rep. No. 100–446, at 1–2 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, and accommodates "the strong concerns of states that state laws and regulations relating to sophisticated forms of class III gaming be respected on Indian lands where, with few exceptions, such laws and regulations do not [otherwise] apply." *Id.* at 13, 1988 U.S.C.C.A.N. at 3083.

The IGRA's legislative history places great emphasis on the "on Indian lands" requirement. Like the IGRA, neither the Senate Committee Report, nor other IGRA legislative history authorizes Indian gaming activity to be played, even in part, off Indian lands. For instance, when discussing the use of modern technology to facilitate class II tribal gaming, the Senate Committee Report adheres to the historical meaning associated with, as well as the plain meaning of, the "on Indian lands" requirement. The Report states:

> In this regard [*i.e.*, as to the use of modern technology], the Committee recognizes that tribes may wish to join with other tribes to coordinate their class II operations and thereby enhance the potential of increasing revenues. For example, linking participant players at various reservations whether in the same or different States, by means of telephone, cable, television or satellite may be a reasonable approach for tribes to take. Simultaneous games participation between and among reservations can be made practical by use of computers and telecommunications technology....

*Id.* at 9, 1988 U.S.C.C.A.N. at 3079; *see Cabazon Band Mission Indians v. Nat'l Indian Gaming Comm'n*, 14 F.3d 633, 636–37 (D.C.Cir.1994) (Senate Report discusses how "communications technology" might link players in remote locations on other reservations).

Moreover, even in the context of class II gaming, which is less stringently regulated than class III gaming, Congress requires that it occur on Indian lands. If the Committee actually intended for the "on Indian lands" requirement to be applied in the manner suggested here by the Tribe, the Committee in the above referenced report would not have limited the use of "telephone, cable, television or satellite" to "between and among reservations." Instead, consistent with the plain and historical meaning of "on Indian lands," Congress recognized that technology could only be used to link reservations and players on those reservations.

It is one thing to link players at several locations, all of which are on Indian lands. It is quite another thing to link any person at any time and any place by phone or other electronic means to an Indian reservation that wants to play host to unre-

stricted gambling from all quarters, and thereby circumvent the clear geographical limitation of the IGRA that gaming must occur on Indian lands. The careful balance set by Congress in the IGRA, respecting rights and interests of Indian tribes, state governments, and the federal government, and their citizens, is upset by the NIL's planned disregard of geographic limitation for gaming. I see no real possibility that Congress could have intended what is here proposed, nor does Congress' language in the IGRA support the Tribe's strained construction in its rush towards national if not international and certainly unrestricted gaming.

B. Because the IGRA Unambiguously Prohibits the NIL, We Have No Occasion to Apply the IGRA Liberally in Favor of the Tribe.

The Tribe argues that, because the IGRA is ambiguous as to the legality of the NIL and because the statute was enacted to benefit Indian tribes, the IGRA must be construed liberally in favor of the Native Americans. *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985). Certainly there is authority supporting that certain statutes enacted for the benefit of Native Americans must be interpreted liberally in their favor *where an ambiguity exists. See, e.g., Bishop Paiute Tribe v. County of Inyo,* 275 F.3d 893, 900–01 (9th Cir.2002). However, as explained above, the IGRA is not ambiguous as to its requirement that all gambling activity be conducted on Indian lands. Accordingly, there is no occasion to apply that canon of construction, and the IGRA must be interpreted according to its plain meaning, under which the NIL, with its off-reservation gaming, is not authorized.

III. *Conclusion.*

The NIGC did not render a final decision as to the legality of the NIL under the IGRA. The premise of the majority's decision is in error. Moreover, the IGRA unambiguously does not authorize the NIL because the NIL contemplates Tribe-sponsored gaming activity that does not occur on Indian land. The district court was correct to grant summary judgment in favor of AT & T. I respectfully dissent from the majority's analysis to the contrary and from the judgment of the court.

